MAY 25, 1970*

No. 1267. STOTLAND ET AL. *v.* PENNSYLVANIA. Appeal from Super. Ct. Pa. dismissed for want of a substantial federal question. MR. JUSTICE BRENNAN took no part in the consideration or decision of this case. ▉

MR. JUSTICE DOUGLAS, dissenting.

In August 1967, the City Council of Philadelphia passed an ordinance authorizing the mayor to declare a state of emergency in the city, "if he finds that the City or any part thereof is suffering or is in imminent danger of suffering civil disturbance, disorder, riot or other occurrence which will seriously and substantially endanger the health, safety and property of the citizens." When a state of emergency is declared, the mayor is authorized to "[p]rohibit or limit the number of persons who may gather or congregate . . . in any outdoor place, except persons who are awaiting transportation, engaging in recreational activities at a usual and customary place, or peaceably entering or leaving buildings." The ordinance provides that the state of emergency shall exist "not in

---

*Except for No. 1267, No. 1392, and No. 1776, Misc., MR. JUSTICE MARSHALL took no part in the consideration or decision of the orders of this date.

excess of two weeks," but that it may be "extended for additional periods of two weeks." There are no provisions for review of the mayor's decision to declare a state of emergency.

On April 4, 1968, the Reverend Martin Luther King, Jr., was assassinated. On April 5, 1968, at 9 p.m., the mayor proclaimed a limited state of emergency, effective until 6 a.m. on April 10, 1968, "unless further extended," and prohibited groups of 12 or more persons from gathering or congregating in any outdoor place, except in those situations authorized by the ordinance. The proclamation contained no specific factual findings to support the conclusion that a threat of "civil disturbance," "disorder," or "riot" existed. The courts below, however, found that the proclamation was supported by various scattered acts of disorder occurring in the city of Philadelphia between the assassination and the proclamation, such as window breaking, damage to automobiles, false alarms of fire, and jostling of pedestrians, some of which occurred incident to demonstrations. There had been disorders in other cities after the assassination.

Appellants were arrested for peaceful, nonviolent participation in outdoor gatherings of 12 or more persons in violation of the proclamation. Three separate gatherings were involved:

1. Several weeks prior to the issuance of the proclamation, the Philadelphia Committee for Non-Violent Action made plans to protest the recommissioning of a battleship, which was to take place on April 6, 1968. A group of approximately 100 gathered at a park near the site of the recommissioning on April 6, planted a tree, and then sat around the tree holding hands and singing. A permit for this demonstration had been issued by the park commission. There were some speakers, but none of them advocated violence. There was no threat of hostility between the demonstrators and any spectators.

There was no evidence of any type of disorder or interference with the activities of others. About 50 of these demonstrators were arrested for violating the proclamation. Among those arrested was appellant Countryman. At the time of this demonstration, more than 10,000 persons were congregated a few blocks away for the recommissioning ceremony. None of those attending that ceremony were arrested.

2. Prior to issuance of the proclamation, members of an organization called People for Human Rights arranged to go to the homes of three United States Congressmen in the Philadelphia area to petition for passage of the Civil Rights Act of 1968. Members of the organization gathered at the home of one of the Congressmen on April 7, 1968, depositing petitions in his mail slot and distributing petitions to passersby. The size of the group eventually grew to 12 persons, at which time these individuals were arrested for violating the proclamation. Appellant Achtenberg was among those arrested. The demonstration was entirely peaceful; there were no incidents of disorder; the demonstrators violated no law other than the proclamation.

3. On April 8, 1968, a meeting was held by University of Pennsylvania students to discuss the mayor's proclamation. A platform was set up on university property, and approximately 200 to 250 people congregated to hear the various speakers. As part of the meeting, a police officer read the proclamation to the group. After being ordered to disperse, most of the group departed, but about 55 remained and peacefully submitted to arrest. Appellant Stotland was among the group arrested. There was no disruptive or disorderly conduct at this meeting. The speeches were not inflammatory. There was no allegation that the meeting created traffic problems, engendered the hostility of onlookers, or involved any breach of the peace.

In short, none of the three meetings in which the appellants took part were other than peaceful, orderly, and noninflammatory; none of them interfered with traffic or disrupted other activities; and none of them involved any violation of any law, save for the mayor's proclamation. This much was conceded by the courts below and is not disputed by the appellee.

At least since *Hague* v. *CIO,* 307 U. S. 496, decided in 1939, the use of public property such as streets and parks has been deemed an important adjunct to the rights of free speech and assembly protected by the First Amendment. States, of course, have the right to place reasonable regulations upon the time, place, and manner of the exercise of the rights of speech and assembly. As the Court said in *Cox* v. *Louisiana,* 379 U. S. 536, 554, one could not, "contrary to traffic regulations, insist upon a street meeting in the middle of Times Square at the rush hour as a form of freedom of speech or assembly." Such regulatory measures, however, must be narrowly drawn to reach only the legitimate objectives of state regulation. Overbreadth is constitutionally fatal, and we carefully scrutinize all such measures for that defect. *Cox* v. *Louisiana,* 379 U. S. 559, 562–564; *Edwards* v. *South Carolina,* 372 U. S. 229, 236–238. The ordinance involved in the *Hague* case, for example, gave the director of public safety of Jersey City, New Jersey, the authority to refuse to issue a permit for a public assembly in or upon the public streets, highways, parks, or buildings of the city, "for the purpose of preventing riots, disturbances or disorderly assemblage." This Court held that ordinance constitutionally infirm, Mr. Justice Roberts stating:

"[The ordinance] can thus, as the record discloses, be made the instrument of arbitrary suppression of free expression of views on national affairs, for the

prohibition of all speaking will undoubtedly 'prevent' such eventualities. But uncontrolled official suppression of the privilege cannot be made a substitute for the duty to maintain order in connection with the exercise of the right." 307 U. S., at 516.

The Philadelphia ordinance involved in this case, and the mayor's proclamation issued under its authority, raise serious questions under the First Amendment. First, the prohibition of assembly extended not merely to publicly owned property, but to "any outdoor place," public or private. Second, the proclamation covered all types of assembly, except for three narrow exceptions, regardless of how peaceful, orderly, and otherwise lawful that assembly might be. Third, there was no limitation on the length of the prohibition, for the state of emergency could be extended indefinitely. Appellants claim that as a regulatory measure, the ordinance and proclamation are unconstitutionally overbroad. I do not see how that question can be deemed to be "insubstantial."

Control of civil disorders that may threaten the very existence of the State is certainly within the police power of government. Yet does a particular proclamation violate equal protection?[1] Is it used to circumvent con-

---

[1] In 1967 the city of Syracuse, New York, imposed a curfew reading as follows: "No person shall enter or remain in any public street, park, square or building in any such part or parts of the city during the hours of the day as may be prescribed by the Mayor."

The City Court granted motions to dismiss informations for violating the curfew, *People* v. *Kearse,* 56 Misc. 2d 586, 289 N. Y. S. 2d 346, saying:

"A curfew law, like any other which restricts the activities or conduct of individuals, adults or minors, must not exceed the bounds of reasonableness. Three primary tests have often been invoked. (1) Is there an evil? (2) Do the means selected to curb the evil have a real and substantial relation to the result sought? (3) If the answer to the first two inquiries is yes, do the means availed of

stitutional procedures for clearing the streets of "undesirable" people? Is it used selectively against an unwelcome minority? Does it give fair notice and are its provisions sufficiently precise so as to survive constitutional challenge? Does it transgress one's constitutional right to freedom of movement which of course is essential to the exercise of First Amendment rights?

I do not intimate that Philadelphia's proclamation has a constitutional infirmity. But the questions are so novel and undecided [2] that we should hear the case.

This Court can serve no higher function than to review serious and substantial questions regarding alleged infringements of the First Amendment rights of speech and assembly, whether they occur in fair weather or in foul.

I would note probable jurisdiction and put the case down for oral argument.

---

unduly infringe or oppose fundamental rights of those whose activities or conduct is curbed? . . . Section 57 of the ordinance demonstrates the evil to be dealt with. The means selected to curb the evil have a real and substantial relation to the result sought; but the means availed of, the total prohibition of *all* persons without exception from *all* of the streets of the city, unduly infringes upon fundamental rights guaranteed by the New York and United States Constitutions." *Id.*, at 594, 289 N. Y. S. 2d, at 355–356.

For the same reason the County Court dismissed the appeal. *People* v. *Kearse*, 58 Misc. 2d 277, 295 N. Y. S. 2d 192.

[2] Comment, Judicial Control of the Riot Curfew, 77 Yale L. J. 1560 (1968); Comment, The Riot Curfew, 57 Calif. L. Rev. 450 (1969); Note, Legislation and Riots—Interaction, 35 Brooklyn L. Rev. 472, 478–481 (1969).