**UNITED STATES of America,**
**Appellee,**

v.

**Victor CHALK, Jr. and Preston Eugene Dobbins, Appellants.**

**No. 14711.**

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 4, 1971.

Decided May 6, 1971.

**1278**

James E. Ferguson, II, Charlotte, N. C. (Chambers, Stein, Ferguson & Lanning, Charlotte, N. C., and Robert Harrell, Asheville, N. C., on brief), for appellants.

Bruce B. Briggs, Asst. U. S. Atty. (Keith S. Snyder, U. S. Atty., on brief), for appellee.

Robert Morgan, Atty. Gen. of North Carolina, and T. Buie Costen and Andrew A. Vanore, Jr., Asst. Attys. Gen., of North Carolina, on brief, for amicus curiae.

Before HAYNSWORTH, Chief Judge, and CRAVEN and BUTZNER, Circuit Judges.

CRAVEN, Circuit Judge:

On September 29, 1969, after a battle between police officers and black students at the Asheville High School, the mayor of Asheville, North Carolina, issued a proclamation that a state of emergency within the meaning of North Carolina General Statutes § 14–288.-1(10) existed within the City of Asheville. Under the authority of Asheville City Ordinance No. 613, enacted pursuant to North Carolina General Statutes § 14–288.12, the mayor's proclamation banned possession off one's own premises of dangerous weapons, explosives, or ammunition; banned all marches, parades, assemblies, or demonstrations on public property; and banned the sale of and consumption (off one's own premises) of alcoholic beverages. A short time later the mayor issued a second proclamation imposing a curfew from 9 p. m. to 6 a. m. The state of emergency was redeclared and the nighttime curfew reimposed each day until terminated by the mayor on October 2, 1969.

At approximately 11 p. m. on September 30, 1969, an automobile driven by Victor Chalk, owned by Preston Dobbins, and in which Dobbins was riding as a passenger, was stopped by Highway Patrol Officer Jennings at an intersection within the Asheville city limits. Chalk and Dobbins were placed under arrest for curfew violation. As Chalk stepped out of the automobile, Jennings saw what appeared to be the butt end of a shotgun partially covered by some papers on the floor behind the front seat.

He reached into the automobile and pulled out the stock and trigger mechanism of a 12-gauge shotgun. After Chalk and Dobbins were placed in custody, a further search of the interior of the automobile by Jennings and other police officers revealed the barrel of the shotgun beneath the papers on the floor, one 12-gauge shotgun shell on the back seat, and a roll of dynamite fuse in the glove compartment.

Chalk, Dobbins, and Dobbins' automobile were taken to the Asheville police station. A search of Dobbins at the police station produced four 12-gauge shotgun shells, two in each sock. Local and state police officers, joined by Federal Agent McGuire of the Alcohol, Tobacco and Firearms Division, conducted a thorough search of Dobbins' automobile. Five dynamite caps were found in a glasses case in the glove compartment. Among the items discovered in the trunk were a quart of charcoal lighter fluid, a soft-drink bottle, a book of matches, a bar of soap, a piece of cloth, and a paper bag containing particles of gunpowder. The items found in Dobbins' automobile formed the basis for Chalk and Dobbins' arrest, indictment, and subsequent conviction for possession of a firearm, i. e., a combination of materials from which an incendiary bomb could be readily produced and which were intended for such use, absent the registration required by 26 U.S.C. § 5841 in violation of 26 U.S.C. § 5861(d).[1]

The only issue presented for review is appellants' claim that they are entitled to acquittal or a new trial because the evidence seized from Dobbins' automobile should have been suppressed.

## I.

They contend first that the search of the automobile was contrary to the Fourth Amendment prohibition against unreasonable searches and seizures. At the time of the search, the Asheville police had in their possession a search warrant issued by a state superior court judge under the authority of North Carolina General Statutes § 14–288.11, which authorized the search of all vehicles entering or approaching Asheville for weapons. We need not consider appellants' arguments that the affidavit on which the warrant was obtained was insufficient, that the warrant unlawfully authorized general searches, or that Dobbins' automobile was not "entering or approaching the City of Asheville" as the warrant specified. Assuming the warrant invalid, the search was amply supportable on a theory of probable cause which itself was sufficient to make this automobile search an entirely reasonable one. Boone v. Cox, 433 F.2d 343 (4th Cir. 1970).

■ ■ Because of its mobility, a search of an automobile without a warrant is reasonable if it is based on probable cause. Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1924); Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). If there is probable cause to search the automobile at the place where it was stopped, it matters not that the search is conducted sometime later after the automobile has been transported to the police station. Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

■ The mayor's proclamation declaring a state of emergency made appellants' possession of a shotgun and ammunition a misdemeanor. At the time of Chalk's arrest, the butt of the shotgun was in the plain view of the arresting officers and thus subject to seizure. Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968). We think the discovery of the stock of the shotgun entitled the arresting officers to conclude that the automobile probably also contained the shotgun barrel and ammunition. When the second search was conducted at the police station, the searching officers knew that the car had

---

1. That the materials could be combined readily to produce an incendiary bomb is not questioned on appeal.

already been found to contain a shotgun, a shotgun shell, and a roll of dynamite fuse. They also knew Dobbins had concealed shotgun shells in each of his socks. Clearly they had probable cause to search the car for additional weapons or explosives.

## II.

Appellants contend alternatively that the search was unlawful because it was triggered by the mayor's overbroad and unlawful restrictions (specifically, the curfew). Appellants' attack is two-pronged: (1) that the statutory scheme authorizing the mayor's declaration of a state of emergency is vague and sweeps overbroadly into areas of constitutionally protected activity; and (2) that there was an insufficient threat to public safety to allow the mayor to impose the restrictions that he did.

■ We think the challenge to the constitutionality of the statutory scheme is without merit. "Control of civil disorders that may threaten the very existence of the State is certainly within the police power of government." Stotland v. Pennsylvania, 398 U.S. 916, 920, 90 S.Ct. 1552, 1555, 26 L.Ed.2d 83 (1970) (Douglas, J. dissenting from the dismissal of an appeal for lack of a substantial federal question). North Carolina General Statutes defines "state of emergency" as: "The condition that exists whenever, during times of public crisis, disaster, rioting, catastrophe, or similar public emergency, public safety authorities are unable to maintain public order or afford adequate protection for lives or property, or whenever the occurrence of any such condition is imminent." N. G.Gen.Stat. § 14–288.1(10). The mayor's power to impose the restraints enumerated in North Carolina General Statutes § 14–288.12 and Asheville City Ordinance No. 613[2] is subject to a "narrow, objective, and definite standard." Shuttlesworth v. Birmingham, 394 U. S. 147, 151, 89 S.Ct. 935, 22 L.Ed.2d 162

(1969). Only when local law enforcement is no longer able to maintain order and protect lives and property may the emergency powers be invoked.

■ The standard is essentially the same as that which applies to the executive's inherent power to restore order through the use of the military. See Luther v. Borden, 48 U.S. (7 How.) 1, 2, 12 L.Ed. 581 (1849); Sterling v. Constantin, 287 U.S. 378, 53 S.Ct. 190, 77 L.Ed. 375 (1932); Note, Judicial Control of the Riot Curfew, 77 Yale L.J. 1560, 1566–68 (1968). Attempting to precisely define under what specific conditions each of the authorized restrictions might be imposed would destroy the "broad discretion" necessary for the executive to deal with an emergency situation. Sterling, *supra* at 398, 53 S.Ct. 190, 77 L.Ed. 375. Appellants' argument that a mayor might use his emergency powers to unnecessarily infringe upon fundamental constitutional rights is unfortunately true, but affords no leverage for decision. "All power may be abused if placed in unworthy hands." Luther, *supra*, 48 U.S. at 44. The courts cannot prevent abuse of power, but can sometimes correct it.

## III.

The invocation of emergency powers necessarily restricts activities that would normally be constitutionally protected. Actions which citizens are normally free to engage in become subject to criminal penalty. A curfew, like ordinances restricting loudspeaker noise and limiting parade permits, doubtless has an incidental effect on First Amendment rights. The standard that has developed where regulation of conduct has an incidental effect on speech is that the incidental restriction on First Amendment freedoms can be no greater than is essential to the furtherance of the government interest which is being protected. See, *e. g.*, United States v. O'Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.

---

2. North Carolina General Statutes § 14–288.12 and Asheville City Ordinance No. 613 are reproduced in the Appendix.

Ed.2d 672 (1968). The limitation on the use of emergency powers by the executive is essentially the same. The declaration of a state of emergency and the restrictions imposed pursuant to it must appear to have been reasonably necessary for the preservation of order. See Note, Judicial Control of the Riot Curfew, 77 Yale L.J. 1560, 1568 (1968).

■■ It is clear that the executive's decision that civil control has broken down to the point where emergency measures are necessary is not conclusive or free from judicial review. See Duncan v. Kahanamoku, 327 U.S. 304, 66 S.Ct. 606, 90 L.Ed. 688 (1946); Sterling v. Constantin, 287 U.S. 378, 53 S.Ct. 190, 77 L.Ed. 375 (1932); Ex parte Milligan, 71 U.S. (4 Wall.) 2, 18 L.Ed. 281 (1866). But we think the scope of our review in a case such as this must be limited to a determination of whether the mayor's actions were taken in good faith and whether there is some factual basis for his decision that the restrictions he imposed were necessary to maintain order. Cf. Moyer v. Peabody, 212 U.S. 78, 29 S.Ct. 235, 53 L.Ed. 410 (1909).[3]

The federal Constitution contemplates that public policy be developed through reasoned debate rather than force of arms. Private force and violence are no less destructive of free debate than government oppression. "The Constitution protects against anarchy as well as tyranny." Ervin v. State, 41 Wis.2d 194, 163 N.W.2d 207, 211 (1968). Cf. Illinois v. Allen, 397 U.S. 337, 347–351, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) (Brennan, J., concurring).[4]

The responsibility for maintaining public peace on a day-to-day basis is lodged with the executive branch of government. As we recently have become all too painfully aware, public peace in our cities may be suddenly breached by massive civil disorder. Dealing with such an emergency situation requires an immediacy of action that is not possible for judges. We think it would be highly inappropriate for us, removed from the primary responsibility for maintaining order and with the benefit of time for reflection not available to the mayor, to substitute our judgment of necessity for his.

In addition, we are mindful that any decision of when and how to exercise emergency restrictions to quell existing or prevent imminent civil disorder is a matter of judgment necessarily involving some speculation. We have some knowledge of the long term causes and long term means of eliminating civil

---

3. A law review commentator, reviewing previous case law dealing with executive use of emergency powers, concluded that "where actual violence, good faith, and a relation between means and ends are shown, an executive's finding of necessity will be upheld in court." Note, Riot Control: The Constitutional Limits of Search, Arrest and Fair Trial Procedure, 68 Colum.L.Rev. 85, 113 (1968).

4. What Mr. Justice Brennan wrote about a trial court's discretionary power to exclude an obstreperous defendant from the courtroom has applicability here.
   "Lincoln said this Nation was 'conceived in liberty and dedicated to the proposition that all men are created equal.' The Founders' dream of a society where all men are free and equal has not been easy to realize. * * * Much remains to be done—so much that the very institutions of our society have come under challenge. Hence, today,

as in Lincoln's time, a man may ask 'whether [this] nation or any nation so conceived and so dedicated can long endure.' It cannot endure if the Nation falls short on the guarantees of liberty, justice, and equality embodied in our founding documents. But it also cannot endure if we allow our precious heritage of ordered liberty to be ripped apart amid the sound and fury of our time. It cannot endure if in individual cases the claims of social peace and order on the one side and of personal liberty on the other cannot be mutually resolved in the forum designated by the Constitution. If that resolution cannot be reached by judicial trial in a court of law, it will be reached elsewhere and by other means, and there will be grave danger that liberty, equality, and the order essential to both will be lost." 397 U.S. at 348, 90 S.Ct. at 1063, 25 L.Ed. 2d 353.

disorders. See Report of the National Advisory Commission on Civil Disorders (Bantam ed., 1968). But we have no means of predicting precisely when major violence may erupt in a particular city. Nor do we have any means of measuring precisely the impact of any one emergency restriction on the level of or potential for violence.[5] Whether the measures employed by the mayor of Asheville were absolutely necessary in order to prevent a serious civil disorder is clearly an important question for political debate, but not, we think, a question for judicial resolution in this case.

It is enough, we think, that there was a factual basis for the mayor's decision to proclaim the existence of a state of emergency and that he acted in good faith. The clash with the police at the Asheville High School involved 200 to 250 high school students. Windows in the school were broken out. Cars parked in the vicinity of the school and cars passing by on the nearby streets were damaged. One car was turned completely over. A number of police officers were injured by flying rocks and other missiles. A number of students were injured by police riot sticks and flying missiles. One student inside the school building was seriously injured by flying glass from a broken window. After the students at the high school were dispersed by the police, they moved on to the campus of the junior high school approximately a mile and a half to two miles away. Again they were met by the police, but this time they dispersed without doing any physical damage to the school building.

During the few weeks prior to September 29, the mayor had attended a number of public meetings at which black residents were pressing for resolution of certain grievances. Some of the statements made by black residents carried strong overtones of threatened violence. During the afternoon of September 29, after viewing the damage at the Asheville High School, the mayor attended two more public meetings at which the concern of the black residents was focused on the incident at the high school. The mayor testified that it was his impression that tensions in the black community had been rising during the few weeks preceding September 29 and that the incident at the high school had served to heighten tensions even more. After receiving the unanimous recommendations of local, state, and federal law enforcement officials, the mayor proclaimed a state of emergency and imposed the nighttime curfew.

Even the emergency restrictions on alcoholic beverages and deadly weapons and the curfew imposed by the mayor during the afternoon of September 29 did not serve to restore complete order. During the following three-day period, the fire department responded to a number of brush fires. Two trucks at a highway construction site were burned. At some of the locations where firemen were fighting fires, they were bombarded by rocks. In the afternoon of September 30, police discovered a number of molotov cocktails stored behind a building near the intersection where Chalk and Dobbins were later stopped. Later that evening, after the curfew had gone into effect and before Chalk and Dobbins were stopped, police at the same intersection were bombarded by rocks and the windows of a drive-in restaurant on the corner were broken out. The assistant chief of police testified that later

5. *See* Glover v. District of Columbia, 250 A.2d 556 (D.C.App.1969), involving an appeal from a conviction for curfew violation during a civil disorder.
   "As a part of our review, we would ordinarily consider the availability of other government responses which could end disorder yet place fewer restrictions on travel, free speech, and assembly. * * * However, we are not aware of any substantiated body of knowledge with regard to how to deal with civil disorder once it has reached the emergency stage. For this reason, we cannot say of any suggested alternative that it would have quelled the rioting as quickly and to the same extent as the curfew here in question."
   250 A.2d at 560. *See also* State v. Boles, 5 Conn. Cir. 22, 240 A.2d 920 (1967).

that same night a burning tire was rolled in front of his car and when he stopped to investigate his car was bombarded with rocks and bricks and other debris.

■ Appellants argue alternatively that the restrictions imposed by the mayor were too broad and unnecessarily restricted protected constitutional rights. Appellants' attack is focused on the curfew imposed by the mayor as a restriction on their right to travel. See Aptheker v. Secretary of State, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964); Kent v. Dulles, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958). But freedom of travel like freedom of speech may be subject to reasonable limitations as to time and place. "The liberty of every American citizen freely to come and to go must frequently, in the face of sudden danger, be temporarily limited or suspended." Korematsu v. United States, 323 U.S. 214, 231, 65 S.Ct. 193, 201, 89 L.Ed. 194 (1944) (Roberts, J., dissenting from what he considered too broad a restriction on the rights of Japanese-Americans to travel during World War II). See also Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943).

The curfew imposed by the mayor was in effect city-wide. Unlike a curfew limited to black neighborhoods which would be "immediately suspect" because of the possibility of racial discrimination, see Korematsu, *supra*, 323 U.S. at 216, 65 S.Ct. 193, 89 L.Ed. 194, a city-wide curfew applies to all. In addition, the curfew applied only at night. In Abernathy v. Conroy, 429 F.2d 1170 (4th Cir. 1970), this court upheld the constitutionality of an ordinance banning parades after 8 p. m. In that opinion, we noted the legitimate state interest in preserving the evening hours as a time of repose and the increased problems of law enforcement during hours of darkness.

■ It is clear that a nighttime curfew is an effective means of controlling or preventing imminent civil disorder. In all of the civil disorders studied by the National Advisory Commission on Civil Disorders, major violence occurred during the evening and nighttime hours. In most instances in which violence was not limited to a single day, daylight brought relative calm and darkness brought renewed violence. Report of the National Advisory Commission on Civil Disorders 123–24 (Bantam ed. 1968). The experience of those cities which imposed curfews early before large crowds could form suggests that curfews may be an effective preventative, but only of limited value in controlling a major disorder once it has begun. See Note, Judicial Control of the Riot Curfew, 77 Yale L.J. 1560, 1563–64 (1968). Even with hindsight we cannot conclude that the curfew was unnecessary, or even that some less extreme expedient might have sufficed.

Since we conclude that the introduction of items seized from Dobbins' automobile was not error, the convictions of appellants Chalk and Dobbins will be

Affirmed.

## APPENDIX

North Carolina General Statutes § 14–288.12:

Powers of municipalities to enact ordinances to deal with states of emergency.—(a) The governing body of any municipality may enact ordinances designed to permit the imposition of prohibitions and restrictions during a state of emergency.

(b) The ordinances authorized by this section may permit prohibitions and restrictions:

(1) Of movements of people in public places;

(2) Of the operation of offices, business establishments, and other places to or from which people may travel or at which they may congregate;

(3) Upon the possession, transportation, sale, purchase, and consumption of intoxicating liquors;

(4) Upon the possession, transportation, sale, purchase, storage, and use of dangerous weapons and substances, and gasoline; and

(5) Upon other activities or conditions the control of which may be reasonably necessary to maintain order and protect lives or property during the state of emergency.

The ordinances may delegate to the mayor of the municipality the authority to determine and proclaim the existence of a state of emergency, and to impose those authorized prohibitions and restrictions appropriate at a particular time.

(c) This section is intended to supplement and confirm the powers conferred by §§ 160–52, 160–200(7), and all other general and local laws authorizing municipalities to enact ordinances for the protection of the public health and safety in times of riot or other grave civil disturbance or emergency.

(d) Any ordinance of a type authorized by this section promulgated prior to June 19, 1969, shall, if otherwise valid, continue in full force and effect without reenactment.

(e) Any person who violates any provision of an ordinance or a proclamation enacted or proclaimed under the authority of this section is guilty of a misdemeanor punishable as provided in § 14–4.

Asheville City Ordinance No. 613:

Section 1. *State of emergency; curfew authorized.*

(a) A state of emergency shall be deemed to exist whenever, during times of great public crisis, disaster, rioting, catastrophe, or similar public emergency, for any reason, municipal public safety authorities are unable to maintain public order or afford adequate protection for lives or property.

(b) In the event of an existing or threatened state of emergency endangering the lives, safety, health and welfare of the people within the City of Asheville, or threatening damage to or destruction of property, the Mayor of the City of Asheville is hereby authorized and empowered to issue a public proclamation declaring to all persons the existence of such a state of emergency, and, in order to more effectively protect the lives and property of people within the City, to place in effect any or all of the restrictions hereinafter authorized.

(c) The Mayor is hereby authorized and empowered to limit by the proclamation the application of all or any part of such restrictions to any area specifically designated or described within the corporate limits of the City and to specific hours of the day or night; and to exempt from all or any part of such restrictions law enforcement officers, firemen and other public employees; doctors, nurses, employees of hospitals and other medical facilities; on-duty military personnel whether state or federal; on-duty employees of public utilities, public transportation companies, and newspaper, magazine, radio broadcasting, and television broadcasting corporations operated for profit; and such other classes of persons as may be essential to the preservation of public order and immediately necessary to serve the safety, health, and welfare needs of the people within the City.

(d) The Mayor shall proclaim the end of such state of emergency or all or any part of the restrictions imposed as soon as circumstances warrant or when directed to do so by the City Council.

(e) During the existence of a proclaimed state of emergency, the Mayor may impose by proclamation any or all of the following restrictions:

(1) Prohibit or regulate the possession off one's own premises of explosives, firearms, ammunition, or dangerous weapons of any kind, and prohibit the purchase, sale, transfer or other disposition thereof;

(2) Prohibit or regulate the buying or selling of beer, wine, or intoxicating beverages of any kind, and their possession or consumption off one's own premises;

(3) Prohibit or regulate any demonstration, parade, march, vigil, participation therein from taking place on any of the public ways or upon any public property;

(4) Prohibit or regulate the sale of gasoline, kerosene, naptha, or any other explosive or inflammable fluids or substances;

(5) Prohibit or regulate travel upon any public street, alley, or roadway or upon any other public property, except by those in search of medical assistance, food, or other commodity or service necessary to sustain the wellbeing of themselves or their families or some member thereof;

(6) Prohibit or regulate the participation in or carrying on of any business activity, and prohibit or regulate the keeping open of places of business, places of entertainment, and any other places of public assembly;

(f) Any proclamation may be extended, altered, or repealed in any particular during the continued or threatened existence of a state of emergency by the issuance of a subsequent proclamation.

(g) During the existence of a proclaimed state of emergency, it shall be unlawful for any person to violate any provision of any restriction imposed by any proclamation authorized by this ordinance.

Section 2. *Severability.* The sections, paragraphs, sentences, clauses, words and phrases of this ordinance are severable, and, if any word, phrase, section, paragraph, sentence, clause shall be declared unconstitutional or invalid by any valid judgment or decree or any court of competent jurisdiction, the constitutionality or invalidity shall not affect any of the remaining phrases, words, clauses, sentences, paragraphs, or sections of this ordinance.

Section 3. *Penalty.* The violation of any provision of this ordinance, or of any provision of any restriction imposed by any proclamation authorized by this ordinance, shall constitute a misdemeanor, punishable upon conviction by a fine not exceeding fifty dollars ($50) or imprisonment not exceeding thirty (30) days, as provided by G. S. § 14–4.