FOR PUBLICATION

FILED

UNITED STATES COURT OF APPEALS

MAY 22 2020

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| SOUTH BAY UNITED PENTECOSTAL CHURCH, a California nonprofit corporation; BISHOP ARTHUR HODGES III, an individual, <br><br> Plaintiffs-Appellants, <br><br> v. <br><br> GAVIN NEWSOM, in his official capacity as the Governor of California; XAVIER BECERRA, in his official capacity as the Attorney General of California; SONIA ANGELL, in her official capacity as California Public Health Officer; WILMA J. WOOTEN, in her official capacity as Public Health Officer, County of San Diego; HELEN ROBBINS-MEYER, in her official capacity as Director of Emergency Services; WILIAM D, GORE, in his official capacity as Sheriff of the County of San Diego, <br><br> Defendants-Appellees. | No. 20-55533 <br><br> D.C. No. 3:20-cv-00865-BAS-AHG Southern District of California, San Diego <br><br> ORDER |

Before: SILVERMAN, NGUYEN, and COLLINS, Circuit Judges.

This appeal challenges the district court's denial of appellants' motion for a

temporary restraining order and order to show cause why a preliminary injunction

should not issue in appellants' challenge to the application of the State of

California and County of San Diego's stay-at-home orders to in-person religious

LCC/MOATT

services.  Appellants have filed an emergency motion seeking injunctive relief permitting them to hold in-person religious services during the pendency of this appeal.

We have jurisdiction to review the denial of a temporary restraining order where, as here, "the circumstances render the denial 'tantamount to the denial of a preliminary injunction.'"  *Religious Tech. Ctr., Church of Scientology Int'l, Inc. v. Scott*, 869 F.2d 1306, 1308 (9th Cir. 1989) (internal citation omitted); *see also* 28 U.S.C. § 1292(a)(1).  Accordingly, the motion to dismiss for lack of jurisdiction (Docket Entry No. 24) is denied.

The request to take judicial notice (Docket Entry No. 25) is granted.

In evaluating a motion for an injunction pending appeal, we consider whether the moving party has demonstrated that they are likely to succeed on the merits, that they are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in their favor, and that an injunction is in the public interest.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Feldman v. Ariz. Sec'y of State's Office*, 843 F.3d 366, 367 (9th Cir. 2016) ("The standard for evaluating an injunction pending appeal is similar to that employed by district courts in deciding whether to grant a preliminary injunction.").

We conclude that appellants have not demonstrated a sufficient likelihood of success on appeal. Where state action does not "infringe upon or restrict practices because of their religious motivation" and does not "in a selective manner impose burdens only on conduct motivated by religious belief," it does not violate the First Amendment. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533, 543 (1993). We're dealing here with a highly contagious and often fatal disease for which there presently is no known cure. In the words of Justice Robert Jackson, if a "[c]ourt does not temper its doctrinaire logic with a little practical wisdom, it will convert the constitutional Bill of Rights into a suicide pact." *Terminiello v. City of Chicago*, 337 U.S. 1, 37 (1949) (Jackson, J., dissenting).

The remaining factors do not counsel in favor of injunctive relief. *See Winter*, 555 U.S. at 20. We therefore deny the emergency motion for injunctive relief pending appeal (Docket Entry No. 2).[1]

---

[1] Judge Collins would grant the motion and has filed a dissent.

*South Bay United Pentecostal Church v. Newsom*, No. 20-55533

COLLINS, Circuit Judge, dissenting:

Plaintiffs-Appellants South Bay United Pentecostal Church (the "Church") and its Bishop, Arthur Hodges III (collectively, "Plaintiffs"), move for a preliminary injunction pending appeal that would allow them to conduct in-person church services. The State of California's refusal to allow them to hold such services likely violates the Free Exercise Clause of the First Amendment, and so I would grant the requested injunction. Because the majority concludes otherwise, I respectfully dissent.

## I

The Church is a Christian congregation in Chula Vista, California. Until the recent COVID-19 pandemic, the Church held between three and five Sunday services every week, which would attract 200–300 congregants each. Its sanctuary seats 600.

On March 19, 2020, Governor Gavin Newsom issued Executive Order N-33-20. The order generally required "all individuals living in the State of California to stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure sectors." The federal list of critical sectors did not include churches. The State public health officer subsequently designated a comprehensive set of "Essential Critical Infrastructure

1

Workers." That list designated clergy as essential, but only if they were holding services "through streaming or other technologies that support physical distancing and state public health guidelines."

On April 28, the Governor announced a four-stage "Reopening Plan" or "Resilience Roadmap," under which the State would initially relax the stay-at-home order for some organizations but not others. At Stage 1, only "critical infrastructure" was exempted. At Stage 2, curbside retail and additional factories making previously non-essential "things like toys, clothing, . . . [and] furniture" would be permitted to reopen. Stage 2 entities also included ones that would reopen at a later date within that stage, such as schools (in an adapted form), childcare, dine-in restaurants, outdoor museums, "destination retail, including shopping malls and swap meets," and office-based businesses where telework is not possible. At Stage 3, "higher risk workplaces" like churches could reopen, along with bars, movie theaters, hair salons, and "more personal & hospitality services." And at Stage 4, concerts, conventions, and spectator sports could reopen. The Governor predicted that while Phase 2 would begin in "weeks, not months," Phase 3 would begin in "months, not weeks."

On May 4, the Governor announced that Stage 2 would commence within a week. On May 8, Plaintiffs sued the Governor and several other state officers (collectively, "the State") as well as various local officials, claiming that the

2

Reopening Plan's decision to place churches within Stage 3 instead of Stage 2 violated the Free Exercise Clause of the First Amendment. The County of San Diego implemented the Reopening Plan in an order dated May 9, 2020. Plaintiffs filed an amended complaint on May 11.

On May 15, 2020, the district court denied Plaintiffs' motion for both a temporary restraining order ("TRO") and an order to show cause ("OSC") why a preliminary injunction allowing the Church to hold in-person services should not issue. Plaintiffs appealed and concurrently moved for a preliminary injunction in this court.

## II

We have jurisdiction over this appeal under our controlling decision in *Religious Tech. Ctr., Church of Scientology Int'l, Inc. v. Scott*, 869 F.2d 1306 (9th Cir. 1989).[1] Both in *Religious Tech. Ctr.* and in this case, the plaintiffs filed a motion for a TRO and for an OSC why a preliminary injunction should not issue; the district court denied the motion "for a TRO and an OSC following a hearing at which all parties were represented"; and the specific grounds on which the district court denied the motion "foreclosed any interlocutory relief." *Id*. at 1308–09. As to the latter point, the district court below agreed with the State that the Reopening

[1] The State questioned our jurisdiction in its initial opposition to Plaintiffs' motion in this court, but it did not renew that objection in its subsequent formal opposition. Nonetheless, we have an obligation to consider the issue *sua sponte*.

Plan is a "neutral law of general application" that is therefore subject only to rational basis review under *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). Given that this threshold legal conclusion is indisputably fatal to Plaintiffs' Free Exercise claim, "[t]he futility of any further hearing was thus patent; there was nothing left to talk about." *Id.* at 1309. The order was thus "tantamount to a denial of a preliminary injunction," *id.* at 1308, and we therefore have jurisdiction under 28 U.S.C. § 1292(a)(1).

## III

Plaintiffs seek a preliminary injunction pending appeal, and the standards for such relief are well-settled. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "Under our 'sliding scale' approach, 'the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another.'" *Hernandez v. Sessions*, 872 F.3d 976, 998 (9th Cir. 2017) (quoting *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012)). Here, all of these factors favor the Plaintiffs.

4

**A**

In seeking injunctive relief pending appeal, Plaintiffs principally rely on their claim under the First Amendment's Free Exercise Clause, which provides that "Congress shall make no law respecting an establishment of religion, or *prohibiting the free exercise thereof*." U.S. CONST. amend. I (emphasis added). This restriction is fully applicable to the States through the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). I conclude that Plaintiffs have established a very strong likelihood of success on the merits of their Free Exercise claim.

**1**

As a threshold matter, the State contends that, in light of the ongoing pandemic, the constitutional standards that would normally govern our review of a Free Exercise claim should *not* be applied. "Although the Constitution is not suspended during a state of emergency," the State tells us, "constitutional rights may be reasonably restricted 'as the safety of the general public may demand'" (quoting *Jacobson v. Massachusetts*, 197 U.S. 11, 29 (1905)). According to the State, the current emergency conditions preclude us from applying *Lukumi*'s familiar framework for evaluating Free Exercise claims and require us instead to apply *Jacobson*'s "highly deferential" standard of review, under which we are supposedly limited "'to a determination of whether the [Governor's] actions were

taken in good faith and whether there is some factual basis for [the] decision'" (quoting *United States v. Chalk*, 441 F.2d 1277, 1281 (4th Cir. 1971)).  As the State sees it, there is no "reason why *Jacobson* would not extend *to the First Amendment and other constitutional provisions*" (emphasis added).  I am unable to agree with this argument, which seems to me to be fundamentally inconsistent with our constitutional order.  *Cf. Sterling v. Constantin*, 287 U.S. 378, 397–98 (1932) ("If this extreme position could be deemed to be well taken, it is manifest that the fiat of a state Governor, and not the Constitution of the United States, would be the supreme law of the land; that the restrictions of the Federal Constitution upon the exercise of state power would be but impotent phrases[.]").

The State's motion cites no authority that can justify its extraordinary claim that the current emergency gives the Governor the power to restrict any and all constitutional rights, as long as he has acted in "good faith" and has "some factual basis" for his edicts.  Nothing in *Jacobson* supports the view that an emergency *displaces* normal constitutional standards.  Rather, *Jacobson* provides that an emergency may justify temporary constraints *within* those standards.  As the Second Circuit has recognized, *Jacobson* merely rejected what we would now call a "substantive due process" challenge to a compulsory vaccination requirement, holding that such a mandate "was within the State's police power."  *Phillips v. City of New York*, 775 F.3d 538, 542 (2d Cir. 2015); *see also Zucht v. King*, 260 U.S.

6

174, 176 (1922) (*Jacobson* "settled that it is within the police power of a state to provide for compulsory vaccination"). *Jacobson*'s deferential standard of review is appropriate in that limited context. It might have been relevant here if Plaintiffs were asserting a comparable substantive due process claim, but they are not.

Instead, Plaintiffs assert a claim under the Free Exercise Clause, whose standards are well-established and which applies to the States under the Fourteenth Amendment. *Cantwell*, 310 U.S. at 303. *Jacobson* had no occasion to address a Free Exercise claim, because none was presented there. (That is unsurprising, because the Free Exercise Clause had not yet been held to apply to the States when *Jacobson* was decided in 1905. *See Phillips*, 775 F.3d at 543.) Consequently, *Jacobson* says nothing about what standards would apply to a claim that an emergency measure violates some other, *enumerated* constitutional right; on the contrary, *Jacobson* explicitly states that other constitutional limitations may continue to constrain government conduct. *See* 197 U.S. at 25 (emergency public health powers of the State remain subject "to the condition that no rule . . . shall contravene the Constitution of the United States, nor infringe any right granted or secured by that instrument"). The State suggests that the Second Circuit's decision in *Phillips* applied *Jacobson* to bar a First Amendment challenge, but *Phillips* actually confirms my narrower reading of *Jacobson*. After applying *Jacobson* to reject the plaintiffs' *substantive due process* challenge to New York's vaccination

7

requirement, the court then addressed (and rejected) the plaintiffs' Free Exercise challenge by applying not *Jacobson*, but the familiar *Lukumi* framework that governs all Free Exercise claims. *See Phillips*, 775 F.3d at 543.

The Fourth Circuit's decision in *Chalk* likewise provides no support for the State's position. In *Chalk*, the defendants were pulled over for driving at 11:00 PM in violation of Asheville, North Carolina's four-night curfew, and a search of their car revealed dynamite caps and other "materials from which an incendiary bomb could be readily produced." *See* 441 F.2d at 1278–79. On appeal from the defendants' subsequent convictions, the Fourth Circuit rejected the defendants' challenge to the traffic stop, which was "focused on the curfew imposed by the mayor as a restriction on *their right to travel*." *Id*. at 1283 (emphasis added). Applying a deferential standard of review, the court held that the temporary travel restrictions imposed by the short-lived curfew were justified in light of the significant civil unrest in Asheville that had led to the curfew order. *Id*. at 1282–83. Given that the defendants were not engaged in any expressive (or religious) activity while driving, the First Amendment was not directly implicated by the traffic stop in *Chalk*, and so the decision has little relevance here. If anything, *Chalk*'s discussion of the First Amendment undercuts the State's argument. The Fourth Circuit stated in dicta that any incidental impact on First Amendment rights from the curfew would be governed by the intermediate scrutiny standard of

*United States v. O'Brien*, 391 U.S. 367 (1968), and the court likened the brief restriction on travel to a time, place, and manner restriction. *See* 441 F.2d at 1280–81, 1283. The fact that *Chalk* attempted to fit its comments within such existing First Amendment categories refutes the State's notion that the existence of an emergency results in a wholesale displacement of conventional constitutional standards.

Moreover, the State overlooks that we have expressly rejected a comparably broad reading of *Chalk* in addressing a First Amendment challenge to "an emergency order prohibiting access to portions of downtown Seattle, Washington, during the 1999 World Trade Organization (WTO) conference." *Menotti v. City of Seattle*, 409 F.3d 1113, 1117, 1142 n.55 (9th Cir. 2005). Instead of applying a broad "'emergency exception'" based on *Chalk*, we analyzed the emergency order *within* the rubric of established First Amendment time, place, and manner principles, which we held provided ample room to "take[] into account a balance of the competing considerations of expression and order." *Id*. at 1142 & n.55.

Accordingly, I conclude that Plaintiffs' challenge must be evaluated under the traditional *Lukumi* framework that governs Free Exercise claims.[2]

---

[2] Notably, the State does not cite or rely upon the circuit court decision that most directly supports its reading of *Jacobson*, which is *In re Abbott*, 954 F.3d 772 (5th Cir. 2020). For the reasons stated, I am unable to agree with the Fifth Circuit's conclusion that "*Jacobson* instructs that *all* constitutional rights may be reasonably restricted to combat a public health emergency." *Id*. at 786 (emphasis in original);

9

**2**

In addressing a Free Exercise claim under *Lukumi*, the first question is whether the challenged restriction is one "that is neutral and of general applicability." 508 U.S. at 531. If the answer is yes, then "we review [it] for a rational basis." *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1084 (9th Cir. 2015). If the answer is no, then the restriction is subject to strict scrutiny—that is, it "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Lukumi*, 508 U.S. at 531–32. In denying the requested relief, the district court held that the State's Reopening Plan is a "neutral law of general application" and that it "is rationally based on protecting safety and stopping the virus spread." Alternatively, the district court held that the Reopening Plan is narrowly tailored to promote the State's compelling interest in public health.[3] In my view, Plaintiffs have a high likelihood of success in their appeal of these rulings.

---

*see also In re Rutledge*, 956 F.3d 1018, 1028 (8th Cir. 2020) (generally endorsing the Fifth Circuit's description of emergency powers under *Jacobson*). Beyond that limited observation, I express no view on the very different substantive constitutional questions presented in those cases.

[3] The district court actually reached this alternative conclusion in the context of addressing Plaintiffs' likelihood of success on their Free Exercise claim under the *California* Constitution. Reliance on the California Constitution, however, would be inappropriate here. *See Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89 (1984).

**a**

As the Supreme Court explained in *Lukumi*, "the minimum requirement of neutrality is that a law not discriminate on its face." 508 U.S. at 533. Accordingly, where a regulation's operative language restricts conduct by *explicit* reference to the conduct's religious character, it is not facially neutral. *Id.* (citing the law at issue in *McDaniel v. Paty*, 435 U.S. 618 (1978), which applied specifically to members of the clergy, as an example of a law that on its face "imposed special disabilities on the basis of religious status") (cleaned up). Because the restrictions at issue here explicitly "reference . . . religious practice, conduct, belief, or motivation," they are not "facially neutral." *Stormans*, 794 F.3d at 1076.

In framing its restrictions in response to the pandemic, California did not purport simply to proscribe specific forms of underlying physical conduct that it identified as dangerous, such as failing to maintain social distancing or having an excessive number of persons within an enclosed space. Instead, Executive Order N-33-20 presumptively prohibited California residents from leaving their homes for any reason, except to the extent that an *exception* to that order granted *back* the freedom to conduct particular activities or to travel back and forth to such activities. *See* Cal. Exec. Order N-33-20 (Mar. 19, 2020)[4] (ordering "all

---

[4] *See* https://www.gov.ca.gov/wp-content/uploads/2020/03/3.19.20-attested-EO-N-33-20-COVID-19-HEALTH-ORDER.pdf.

11

individuals living in the State of California to stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure sectors," except as the State "may designate additional sectors as critical").[5]  In announcing its Reopening Plan, the State has adopted a phased approach that will progressively add more and more exceptions to the baseline stay-at-home prohibition by designating additional specific categories of activities that, in the State's judgment, do not present an undue risk to public health.  *See* Order of the Cal. Pub. Health Officer (May 7, 2020)[6] ("I will progressively designate sectors, businesses, establishments, or activities that may reopen with certain modifications, based on public health and safety needs, and I will add additional sectors, businesses, establishments, or activities at a pace designed to protect public health and safety.").

As set forth by the State, the four-stage Reopening Plan assigns "retail (curbside only), manufacturing & logistics" to the initial portion of "Phase 2," and in-store retail, "child care, offices & limited hospitality, [and] personal services" to

---

[5] Even the most ardent proponent of a broad reading of *Jacobson* must pause at the astonishing breadth of this assertion of government power over the citizenry, which in terms of its scope, intrusiveness, and duration is without parallel in our constitutional tradition.  But since Plaintiffs do not directly challenge the validity of the original Order here, I do not address the point further.

[6] *See* https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/SHO%20Order%205-7-2020.pdf.

a later portion of Phase 2. (On May 20, 2020, San Diego County was given approval to begin this later portion of Phase 2; it aims to promptly reopen both dine-in restaurants and in-store retail businesses.[7]) By contrast, "religious services" are *explicitly* assigned to a "Stage 3" that also includes "movie theaters" and other "personal & hospitality services." All reopenings under the Plan are subject to detailed, activity-by-activity State guidance that sets forth the specific actions that each activity (such as "manufacturing" or "warehousing facilities") must take (*e.g.*, use of face coverings, social distancing, sanitation, and employee training) in order to reopen, and to stay open.

By *explicitly* and categorically assigning all in-person "religious services" to a future Phase 3—without any express regard to the number of attendees, the size of the space, or the safety protocols followed in such services[8]—the State's Reopening Plan undeniably "discriminate[s] on its face" against "religious conduct." *Lukumi*, 508 U.S. at 533. Although the State insists that it has not acted out of antipathy towards religion, the "constitutional benchmark is 'government

---

[7] *See* Lori Weisberg, *San Diego County gets the OK from state to resume dining-in at restaurants*, SAN DIEGO UNION-TRIBUNE (May 20, 2020), https://www.sandiegouniontribune.com/business/story/2020-05-20/san-diego-county-gets-the-ok-from-state-to-resume-dining-in-at-restaurants.

[8] In this respect, this case differs from *Roberts v. Neace*, __ F.3d __, 2020 WL 2316679 (6th Cir. May 9, 2020), in which the challenged order prohibited "[a]ll mass gatherings," and "faith-based" events were merely listed as one *example* of such "mass gatherings." *Id*. at *1, 3.

*neutrality*,' not 'government avoidance of bigotry.'" *Roberts*, 2020 WL 2316679, at \*4 (quoting *Colorado Christian Univ. v. Weaver*, 534 F.3d 1245, 1260 (10th Cir. 2008)).  Because the Reopening Plan, on its face, is not neutral, it is subject to strict scrutiny.  *Lukumi*, 508 U.S. at 531–32.

**b**

Even if the Reopening Plan were not facially discriminatory, it would still fail *Lukumi*'s additional requirement that the restrictions be "of general applicability."  508 U.S. at 531.

Under California's approach—in which an individual can leave the home only for the *enumerated* purposes specified by the State—these categories of authorized activities provide the operative rules that govern one's conduct.  While the resulting highly reticulated patchwork of designated activities and accompanying guidelines may make sense from a public health standpoint, there is no denying that this amalgam of rules is the very antithesis of a "generally applicable" prohibition.  The State is continually making judgments, at the margins, to decide what additional activities its residents may and may not engage in, and thus far, "religious services" have not made the cut.  I am at a loss to understand how the State's current maze of regulations can be deemed "generally applicable."  *See Ward v. Polite*, 667 F.3d 727, 740 (6th Cir. 2012) ("At some point, an exception-ridden policy takes on the appearance and reality of a system

14

of individualized exemptions, the antithesis of a neutral and generally applicable policy.").

The State contends that its plan is generally applicable because it assertedly classifies activities neutrally, in accordance with the State's sense of their perceived risk. But that is not how the Reopening Plan works. Warehousing and manufacturing facilities are categorically permitted to open, so long as they follow specified guidelines. But in-person "religious services"—merely *because* they are "religious services"—are categorically *not* permitted to take place *even if they follow the same guidelines*. This is, by definition, *not* a generally applicable regulation of underlying physical conduct.

### 3

The only remaining question is whether the Reopening Plan's treatment of religious services satisfies strict scrutiny. The district court concluded that it did, but that is plainly wrong.

The State's undeniably compelling interest in public health "could be achieved by narrower [regulations] that burdened religion to a far lesser degree." *Lukumi*, 508 U.S. at 546. As Plaintiffs have reiterated throughout these proceedings, they will "comply[] with every single guideline that other businesses are required to comply with." In their papers in the district court, Plaintiffs provided a list illustrating the range of measures they are ready and willing to

15

implement on reopening, including spacing out the Church's seating, requiring congregants to wear face coverings, prohibiting the congregation from singing, and banning hugging, handshakes, and hand-holding. By regulating the specific underlying risk-creating *behaviors*, rather than banning the particular *religious setting* within which they occur, the State could achieve its ends in a manner that is the "least restrictive way of dealing with the problem at hand." *Roberts*, 2020 WL 2316679, at *5.[9]

The State's only response on the narrow-tailoring point is to insist that there is too much risk that congregants will not follow these rules. But as the Sixth Circuit recently explained in *Roberts*, the State's position on this score illogically assumes that the very same people who cannot be trusted to follow the rules at their place of worship *can* be trusted to do so at their workplace: the State cannot "assume the worst when people go to worship but assume the best when people go to work or go about the rest of their daily lives in permitted social settings." *Roberts*, 2020 WL 2316679, at *3.

\*     \*     \*

Therefore, I conclude that Plaintiffs are highly likely to succeed on the merits of their Free Exercise Clause claim.

---

[9] On this score, it is noteworthy that, earlier today, the CDC issued "Interim Guidance for Communities of Faith." *See* https://www.cdc.gov/coronavirus/2019-ncov/php/faith-based.html.

16

**B**

All of the remaining considerations strongly favor the entry of an injunction pending appeal. The Bishop's inability to hold in-person worship services, and the Church members' inability to attend them, are certainly irreparable injuries. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1008 (10th Cir. 2004) (en banc) (Seymour, J., concurring in relevant part for a majority of the court) ("[T]he violation of one's right to the free exercise of religion necessarily constitutes irreparable harm."), *aff'd sub nom. Gonzales v. O Centro Espirita Beneficiente Uniao Do Vegetal*, 546 U.S. 418 (2006). The injury here is particularly poignant, given that Pentecost—which the eponymously named Church greatly desires to celebrate—falls on May 31. Indeed, the State explicitly "does not question the sincerity of Plaintiffs' belief that it is essential to gather in person for worship services."

I do not doubt the importance of the public health objectives that the State puts forth, but the State can accomplish those objectives without resorting to its current inflexible and overbroad ban on religious services. The balance of equities, and the public interest, strongly favor requiring the State to honor its constitutional

17

duty to accommodate a critical element of the free exercise of religion—public worship.

For these reasons, I would grant Plaintiffs' request for a preliminary injunction.  I respectfully dissent.