Filed 12/24/25  Siddell v. City of San Diego CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| LEROY GEORGE SIDDELL, | D084679 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2022-00025224-CU-EI-CTL) |
| CITY OF SAN DIEGO, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, James A. Mangione, Judge.  Affirmed.

Leroy George Siddell, in pro. per., for Plaintiff and Appellant.

Heather Ferbert, City Attorney, M. Travis Phelps, Assistant City Attorney and Jana Mickova Will, Deputy City Attorney for Defendant and Respondent.

Plaintiff and appellant Leroy George Siddell appeals a judgment in favor of the City of San Diego (City) following a bench trial on Siddell's complaint, assertedly filed on behalf of all San Diego taxpayers, challenging

an ordinance that placed a temporary moratorium on no-fault residential evictions in the city of San Diego. Following that proceeding, the trial court ruled Siddell and the other plaintiffs lacked standing to bring the complaint. It alternatively ruled the ordinance was neither a per se physical taking nor a regulatory taking. Siddell contends the court erred in these rulings, in part because the plaintiffs properly invoked taxpayer standing under Code of Civil Procedure[1] section 526a or alternatively were entitled to sue as private attorneys general under section 1021.5. We affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In April 2022, during the COVID-19 pandemic,[2] City passed Ordinance No. O-214471 (the ordinance), which imposed a temporary moratorium on no-fault residential evictions in the city of San Diego. The ordinance, with

---

[1]    Undesignated statutory references are to the Code of Civil Procedure.

[2]    The ordinance at issue recounts the COVID-19 health threat and various declarations of emergency leading up to state eviction protections and the ordinance's passage. The United States District Court for the Southern District of California in *Southern California Rental Housing Association v. County of San Diego* (S.D.Cal. 2021) 550 F.Supp.3d 853 summarized facts giving rise to the COVID-19 public health emergency. (*Id.* at pp. 857-859.) The circumstances led to "[r]egulations . . . put in place by federal, state, and local governments to slow the spread of the disease by requiring limited social contact, and self-quarantining citizens at home," as well as ordinances imposing a short-term eviction moratorium. (*Id.* at p. 859 [addressing County of San Diego ordinance].) The *Southern California Rental Housing* district court reviewed a motion for a preliminary injunction, and addressed an association's likelihood of success on the merits on a claim that a San Diego County eviction moratorium ordinance violated the Takings Clause of the federal constitution's Fifth Amendment. (*Id.* at pp. 860, 864-867.) This court in *640 Tenth, LP v. Newsom* (2022) 78 Cal.App.5th 840 likewise provided some background on the pandemic in addressing whether the Governor's emergency COVID-19 orders restricting business operations constituted a regulatory taking. (*Id.* at pp. 849-850, 859-865.)

specified exceptions,[3] prohibited landlords from evicting or attempting to evict tenants where the grounds for terminating the tenancy or occupancy was not based on any alleged tenant fault. The ordinance was to remain in effect until September 30, 2022, or 60 days after City's mayor declared the end of the local state of emergency, whichever occurred first. The ordinance lapsed on September 30, 2022.

In June 2022, Siddell sued City allegedly on behalf of all San Diego taxpayers and landowners, as well as in the capacity of a private attorney general under section 1021.5. Siddell alleged the ordinance violated the state and federal Constitutions amounting to an "unlawful taking of property rights without any provision of just compensation" and an "unlawful attempt to exercise eminent domain power." He alleged the ordinance made no provision for just compensation for landlord property owners, and thus violated federal due process. He sought a permanent injunction against the ordinance's enforcement,[4] a declaration that it be declared null and void, section 1021.5 attorney fees, costs, and inverse condemnation damages. City answered the complaint, asserting as one affirmative defense, among others, that the plaintiffs lacked standing.

---

[3]    The exceptions were when a landlord, with six months prior written notice, intended to withdraw all rental units from the rental market; the landlord sought to recover possession for repair or construction work under an order that the unit be vacated due to safety or habitability or where continued occupancy severely threatened the occupants' immediate health and safety; or the landlord or specified family members intended to occupy the unit as their primary residence upon 90 days prior written notice.

[4]    The parties agreed during the course of proceedings that Siddell's request for injunctive relief was moot. The moratorium lapsed in September 2022, thus, no effective injunctive relief could be granted.

The court eventually bifurcated the issue of liability from damages on the inverse condemnation claim. It set the matter for trial on the pleadings and declarations only. Siddell filed a trial brief, arguing in part that the ordinance constituted a per se taking or alternatively a regulatory taking. City filed an opposing brief. It argued Siddell lacked standing to bring the suit, pointing out he failed to allege he owned any residential property within City subject to the ordinance or suffered any injury in fact because of the ordinance. City asked the court to take judicial notice of executive orders, an emergency ordinance and an April 2022 staff report. The parties agreed that trial would be on the pleadings filed and declarations, without live witnesses.

The matter came on for trial in June 2024. Siddell did not appear. City submitted on the tentative ruling, which the court confirmed. Granting City's requests for judicial notice,[5] the court first ruled that the complaint failed to allege facts showing that the plaintiffs had standing to sue. More specifically, the court ruled "the complaint fails to allege that either . . . Siddell, or any of the 'Taxpayers' on whose behalf Siddell brings the complaint, are landlords within the City of San Diego who are subject to the ordinance. Allegations that 'plaintiffs are taxpayers and landowners within the City of San Diego' . . . , without more, are insufficient." The court observed the complaint also failed to allege "that either . . . Siddell or the taxpayers suffered an injury in fact because of the ordinance."

---

[5] On appeal, Siddell does not challenge the propriety of judicial notice of the matters submitted by City. Ordinances are appropriately judicially noticeable as "legislative enactments issued by . . . any public entity in the United States." (Evid. Code, § 452, subd. (b); see *Hovannisian v. City of Fresno* (2024) 107 Cal.App.5th 833, 843.) Likewise, on City's unopposed request, the court properly took judicial notice of the executive orders. (*640 Tenth, LP v. Newsom*, *supra*, 78 Cal.App.5th at p. 850, fn. 4.)

4

Alternatively, the court ruled that plaintiffs had not established the ordinance effected a taking. It found the ordinance was "not a *per se* physical taking because [it] did not effectuate a permanent physical occupation of plaintiffs' property." It further found "[n]othing in the terms of the ordinance effectuates a physical taking of any property" and that "the ordinance was expressly time-limited and expired by its own terms on September 20, 2022 [*sic*]." The court rejected Siddell's argument of a regulatory taking, finding City established the circumstances of the COVID-19 pandemic supported applying the doctrine of necessity.[6] The court thus adjudicated the second cause of action in City's favor, and ruled there would not be a separate trial on damages.

Siddell filed this appeal.

## DISCUSSION

### I. *Standing*

Siddell contends the plaintiffs had taxpayer standing under section 526a, and also were entitled to bring the suit as private attorneys general. According to Siddell, the plaintiffs' challenge to the ordinance is a facial constitutional challenge, which "does not require plaintiffs to allege actual enforcement or individualized harm, so long as the ordinance is alleged to be invalid in most or all of its intended applications."

---

[6] The court stated that this principle, reflected in *Lucas v. S.C. Coastal Council* (1992) 505 U.S. 1003, at page 1029, footnote 16, is one " 'absolving the State . . . of liability for the destruction of "real and personal property, in cases of actual necessity, to prevent" . . . or forestall . . . grave threats to the lives and property of others' . . . ." It ruled: "As recognized in *South Bay United Pentecostal Church v. Newsom* (9th Cir. 2020) 959 F.3d 938, the COVID-19 pandemic was as a result of a 'highly contagious and often fatal disease for which there presently is no known cure.' [Citation.] The court finds such circumstances support application of the doctrine [of] necessity. As there is no reply, plaintiffs do not raise any arguments to the contrary."

In response, City argues that because Siddell did not allege or show he owned residential property within City or that he suffered any financial losses because of the ordinance, he lacks standing. City further argues that Siddell waived the issue of section 526a taxpayer standing by failing to raise it in the trial court. In making these arguments, City relies on *Lujan v. Defenders of Wildlife* (1992) 504 U.S. 555 for the elements for standing under article III of the United States Constitution. But Siddell brings state law claims (for an injunction and inverse condemnation under article I, section 19 of the California Constitution) brought in state court, and as we reiterate below, article III principles do not apply. "[T]he constraints of [a]rticle III do not apply to state courts . . . ." (*ASARCO Inc. v. Kadish* (1989) 490 U.S. 605, 617 ["state courts are not bound to adhere to federal standing requirements"].)

A. *Standard of Review*

We reject City's waiver argument based on the nature of standing, which is typically a question of law. (See *San Diegans for Open Government v. Fonseca* (2021) 64 Cal.App.5th 426, 436 [" ' "Both standing and the interpretation of statutes are questions of law to which we typically apply a de novo standard of review" ' "]; *California DUI Lawyers Association v. California Department of Motor Vehicles* (2018) 20 Cal.App.5th 1247, 1258 [exercising de novo review where the facts relevant to taxpayer standing were not in dispute].) "At its core, standing concerns a specific party's interest in the outcome of a lawsuit. [Citations.] We therefore require a party to show that he or she is sufficiently interested as a prerequisite to deciding, on the merits, whether a party's challenge to legislative or executive action independently has merit. [Citation.] In making this threshold determination, our inquiry differs somewhat from the standing analysis

6

employed in the federal courts.  Unlike the federal Constitution, our state Constitution has no case or controversy requirement . . . ."  (*Weatherford v. City of San Rafael* (2017) 2 Cal.5th 1241, 1247-1248 (*Weatherford*); see also *San Diegans for Open Government v. Public Facilities Financing Authority of City of San Diego* (2019) 8 Cal.5th 733, 738.)

" ' "[C]ontentions based on a lack of standing involve jurisdictional challenges and may be raised at any time in the proceeding." ' " (*Zolly v. City of Oakland* (2022) 13 Cal.5th 780, 789 [permitting a city to raise lack of standing for the first time on appeal]; see also *Taking Offense v. State of California* (2025) 18 Cal.5th 891, 910; *Associated Builders and Contractors, Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352, 361.)  When a court dismisses an action for lack of standing, "we must 'view the evidence in the light most favorable to the judgment [or order of dismissal], and are bound by trial court's findings that are supported by substantial evidence.' " (*San Diegans for Open Government v. Fonseca, supra,* 64 Cal.App.5th at p. 436.)

Here, because the trial took place on the pleadings and briefing without witnesses, the underlying fact and circumstances are not in dispute.  We merely assess whether Siddell's complaint's allegations establish standing to sue City over the ordinance.

B. *General Standing*

"Absent specific requirements for a statutory cause of action, standing in civil cases is governed by the 'general standing requirements under . . . section 367.' [Citation.]  . . .  [S]ection 367 requires that an action 'be prosecuted in the name of the real party in interest,' and we have defined a ' "real party in interest" ' as ' " 'any person or entity whose interest will be directly affected by the proceeding' " ' including anyone with ' " 'a direct

interest in the result.' " ' " (*Zolly v. City of Oakland*, *supra*, 13 Cal.5th at p. 789.) " '[L]ost money or property . . . is itself a classic form of injury in fact.' " (*Ibid*.) "Typically, to have standing, a plaintiff must plead an actual justiciable controversy and have some 'special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large.' " (*San Diegans for Open Government v. Public Facilities Financing Authority of City of San Diego*, *supra*, 8 Cal.5th at p. 738.)

Siddell did not address standing in his trial brief, leaving only his complaint's allegations. Though Siddell alleged that the plaintiffs "have suffered financial harm," the complaint merely identified him and the other plaintiffs as "taxpayers and land*owners*" (italics added) within City. He did not allege that while the ordinance was in effect they were landlords, that they had tenants or renters, or that they otherwise had a legal right to pursue eviction or other possessory action. That a person must have been a landlord at the relevant time period to have suffered injury is reflected in the complaint's allegation that persons and entities harmed by the ordinance "may be readily identified" by a City-maintained special tax roll by which City "charges landlords a 'Rental Tax': which is due and payable each and every year and should therefore be current."

Other than the conclusory allegation of harm, the complaint is absent any indication that Siddell or the plaintiffs have a " ' " 'direct interest in the result' " ' " (*Zolly v. City of Oakland*, *supra*, 13 Cal.5th at p. 789) or suffered the requisite impact to have standing under section 367. (Compare, *ibid*. [plaintiffs' allegations that city fees had caused their waste collection to increase every month was sufficient to confer standing].) And because Siddell did not provide a sworn declaration to accompany his trial brief, he did not

8

present evidence on these points. We conclude plaintiffs lack standing under these general standing requirements.

C. *Taxpayer Standing*

"Taxpayer standing derives from . . . section 526a, subdivision (a)." *Thompson v. Spitzer* (2023) 90 Cal.App.5th 436, 453.)[7] "[S]ection 526a . . . authorizes actions by a resident taxpayer against officers of a county, town, city, or city and county to obtain an injunction restraining and preventing the illegal expenditure of public funds." (*Blair v. Pitchess* (1971) 5 Cal.3d 258, 267, superseded by statute on another ground as stated in *Simms v. NPCK Enterprises, Inc.* (2003) 109 Cal.App.4th 233, 242-243.) "The 'primary purpose' of the statute 'is to "enable a large body of the citizenry to challenge governmental action which would otherwise go unchallenged in the courts because of the standing requirement." ' " (*San Diegans for Open Government v. Public Facilities Financing Authority of City of San Diego*, *supra*, 8 Cal.5th at p. 738, fn. 3.)

" '[S]ection 526a provides a mechanism for controlling illegal, injurious, or wasteful actions by [government] officials. That mechanism, moreover, remains available even where the injury is insufficient to satisfy general standing requirements under . . . section 367.' [Citation.] . . . 'In light of

---

7    The statute provides in part: "An action to obtain a judgment, restraining and preventing any illegal expenditure of, waste of, or injury to, the estate, funds, or other property of a local agency, may be maintained against any officer thereof, or any agent, or other person, acting in its behalf, either by a resident therein, or by a corporation, who is assessed for and is liable to pay, or, within one year before the commencement of the action, has paid, a tax that funds the defendant local agency, including, but not limited to, the following: [¶] (1) An income tax. [¶] (2) A sales and use tax or transaction and use tax initially paid by a consumer to a retailer. [¶] (3) A property tax, including a property tax paid by a tenant or lessee to a landlord or lessor pursuant to the terms of a written lease. [¶] (4) A business license tax." (§ 526a, subd. (a).)

[section 526a's] purpose, it is crucial that the statute provide a " 'broad basis of relief.' " [Citation.] Accordingly, [courts have] construed section 526a liberally . . . in light of its remedial purpose.' [Citation.] 'Cases that challenge the legality or constitutionality of governmental actions fall squarely within the purview of section 526a.' " (*Thompson v. Spitzer*, *supra*, 90 Cal.App.5th at pp. 453-454, quoting *Weatherford, supra,* 2 Cal.5th at pp. 1249, 1252 & *California DUI Lawyers Association v. Department of Motor Vehicles*, *supra*, 20 Cal.App.5th at p. 1261.)

Notwithstanding these principles, "section 526a does not confer unrestricted standing to taxpayers." (*Weatherford*, *supra*, 90 Cal.App.5th at p. 1251.) A plaintiff must establish "she or he has paid, or is liable to pay, to the defendant locality a tax assessed on the plaintiff by the defendant locality." (*Id.* at p. 1252.) Further, "[a] ' "taxpayer action must involve an actual or threatened expenditure of public funds. [Citation.] [¶] General allegations, innuendo, and legal conclusions are not sufficient [citation]; rather, the plaintiff must cite specific facts and reasons for a belief that some illegal expenditure or injury to the public fisc is occurring or will occur." ' [Citation.] Similarly, the 'term "waste" as used in . . . section 526a means something more than an alleged mistake by public officials in matters involving the exercise of judgment or discretion.' [Citation.] Rather, it is more readily understood as 'a "useless expenditure of funds." [Citation.] Accordingly, [section 526a] should not be applied to principally "political" issues or issues involving the exercise of the discretion of either the legislative or executive branches of government.' [Citation.] Likewise, no claim will 'lie where the challenged governmental conduct is legal.' " (*Collins v. Thurmond* (2019) 41 Cal.App.5th 879, 910; see also *Sundance v. Municipal Court* (1986) 42 Cal.3d 1101, 1138; *Thompson v. Spitzer*, *supra*, 90

10

Cal.App.5th at p. 456; *California DUI Lawyers Association v. Department of Motor Vehicles*, *supra*, 20 Cal.App.5th at p. 1258 ["Case law has made clear that 'waste' does not encompass discretionary governmental action. '[A] taxpayer is not entitled to injunctive relief under . . . section 526a where the real issue is a disagreement with the manner in which government has chosen to address a problem' "].)

While Siddell did not forfeit the question of taxpayer standing by failing to raise it in the trial court, because he did not submit a declaration, there is no evidence from which we can determine the types of taxes he and any other plaintiff paid, or the "specific facts and reasons" on which he relies to demonstrate " ' "that some illegal expenditure or injury to the public fisc is occurring or will occur" ' " (*Collins v. Thurmond*, *supra*, 41 Cal.App.5th at p. 910) as a result of the ordinance's eviction moratorium. We can look only to the allegations of his complaint to determine whether they are sufficient to confer standing.

We conclude they are not. As indicated above, the complaint contains only a conclusory statement that Siddell and the other plaintiffs are "taxpayers and landowners within the City of San Diego." Section 526a limits its reach, and standing to bring an action against a local agency such as City, to "a resident therein . . . , who is assessed for and is liable to pay, or, within one year before the commencement of the action, has paid, a tax that funds the defendant local agency . . . ." (§ 526a, subd. (a).)[8] Such taxes may include an income tax, a sales and use tax, a property tax, or a business license tax. (*Ibid.*) It is true that section 526a should be broadly construed,

_____

[8]     A " '[r]esident' means a person who lives, works, owns property, or attends school in the jurisdiction of the defendant local agency." (§ 526a, subd. (d)(2).) The allegation that plaintiffs are landowners within San Diego meets that requirement.

11

but Siddell's bare legal conclusion that plaintiffs are taxpayers, in this procedural context, is not enough.

We take guidance from *Weatherford*, *supra*, 2 Cal.5th 1241 in reaching this conclusion. There, following the parties' stipulated judgment of dismissal, the high court examined whether a plaintiff must have paid or be liable for property taxes in order establish taxpayer standing. The plaintiff there contended the manner in which a city and county enforced a vehicle code violated both the state and federal constitutions. (*Id.* at p. 1245.) Because she was not personally subject to the practice, she averred she had taxpayer standing, and claimed she had paid sales and gasoline taxes, water and sewage fees, and " 'other taxes, charges and fees routinely imposed' " in the city and county. (*Ibid.*) The Court of Appeal held a plaintiff had to be liable to pay a property tax or have paid it during the prior year to have the necessary standing. (*Id.* at p. 1246.)

The high court reversed. (*Weatherford*, *supra*, 2 Cal.5th at pp. 1252-1253.) Its ability to consider the question was limited by the fact the parties had entered into the stipulated judgment without any factual development, so "basic factual questions—including *which taxes the defendants actually impose*—[were] unresolved." (*Id.* at p. 1252.) The court nevertheless concluded it sufficed that a plaintiff alleged "she or he has paid, or is liable to pay, to the defendant locality a tax assessed on the plaintiff by the defendant locality." (*Ibid.*; see also *Taking Offense v. State*, *supra*, 18 Cal.5th at p. 916 [discussing *Weatherford*].) The court was "certain that the Legislature's purpose, at a minimum, was for the statute to apply where plaintiffs are directly taxed by the defendant locality." (*Weatherford,* at p. 1252.) Given the case's procedural posture, and the fact the "record [was] devoid of information regarding which taxes defendants actually impose, or whether

[plaintiff] has, in fact, paid any assessed taxes to [the city and county]," it remanded for further proceedings. (*Ibid.*)[9]

This case is in a different procedural posture. Siddell's appeal follows a bench trial on the pleadings and declarations, if any, on the parties' agreement that the court would decide the merits solely on that record. Siddell had the burden to establish the plaintiffs' standing. (*Taking Offense v. State*, *supra*, 18 Cal.5th at p. 911.) Under these circumstances, Siddell, who did not address standing in his trial brief or present a declaration delineating the sort of taxes he or any other plaintiff paid or were liable to pay, had a full opportunity to establish the requisite tax liability/payments, but did not. The trial court ruled he did not establish taxpayer standing, and we are required to uphold its ruling if correct on any theory, regardless of its reasoning. (*569 East County Boulevard LLC v. Backcountry Against the Dump, Inc.* (2016) 6 Cal.App.5th 426, 435, fn. 10; *Muro v. Cornerstone Staffing Solutions, Inc.* (2018) 20 Cal.App.5th 784, 790 ["A judgment is

---

[9]     Chief Justice Cantil-Sakauye concurred and pointed out the need to modernize and clarify section 526a. (*Weatherford*, *supra*, 2 Cal.5th at pp. 1253-1255; see *Taking Offense v. State*, *supra*, 18 Cal.5th at pp. 916-917.) Following *Weatherford*, the Legislature amended the statute to clarify what sorts of taxes would be sufficient to confer standing on a taxpayer who paid them to bring an action to restrain or recoup an illegal or wasteful public expenditure. (*Taking Offense*, at pp. 916-917, citing Stats. 2018, ch. 319, § 1.) The Legislature also expanded the target defendants to any local agency and required that plaintiffs reside within the local agency's jurisdiction. (§ 526a, subd. (d); *Taking Offense*, at p. 916.)

presumed correct, and if it is correct on any theory, it must be affirmed regardless of the trial court's reasoning"].)[10]

Even setting aside that conclusion, we would hold that Siddell's claim, at bottom, impermissibly "trespass[es] into the domain of legislative or executive discretion." (*Harman v. City and County of San Francisco* (1972) 7 Cal.3d 150, 160-161; see also *Schmid v. City and County of San Francisco* (2021) 60 Cal.App.5th 470, 496 [ " '[S]ection 526a has its limits. In particular, the courts have stressed that the statute should not be applied to . . . issues involving the exercise of the discretion of either the legislative or executive branches of government' "]; *Humane Society of the United States v. State Bd. of Equalization* (2007) 152 Cal.App.4th 349, 356 [same].) A taxpayer cannot invoke section 526a "where the real issue is a disagreement with the manner in which government has chosen to address a problem because a successful claim requires more than 'an alleged mistake by public officials in matters involving the exercise of judgment or wide discretion.' " (*Coshow v. City of Escondido* (2005) 132 Cal.App.4th 687, 714, quoting *Sundance v. Municipal Court, supra*, 42 Cal.3d at p. 1138.) In *Schmid v. City and County of San*

---

10     Siddell does not specify what sorts of allegedly illegal or wasteful public expenditures City incurred in connection with the ordinance, which imposes restrictions on landlords' conduct. (Compare *Blair v. Pitchess, supra*, 5 Cal.3d at pp. 265-266, 268 [considering challenge to "claim and delivery process" by which a sheriff or marshal could take property without notice; plaintiffs contended the county officials were illegally "expending the time of county officials in executing its provisions" and court observed it liberally applied rule " 'permitting taxpayers to bring a suit to *prevent the illegal conduct of city officials*,' " italics added].) Nor does Siddell argue he has common law taxpayer standing. (See *Taking Offense v. State, supra*, 18 Cal.5th at p. 911; *San Diegans for Open Government v. Fonseca, supra*, 64 Cal.App.5th at p. 438, fn. 6.) The principle would apply to a suit against a government body "involving fraud, collusion, ultra vires or a failure to perform a duty specifically enjoined . . . ." (*Fonseca,* at p. 438, fn. 6.)

14

*Francisco*, for example, the court held that an art commission director who "wielded the executive discretion to remove works of art that did not fit the Commission's vision" per commission's policies and guidelines "cannot be sued under . . . section 526a." (*Schmid v. City and County of San Francisco, supra,* 60 Cal.App.5th at p. 496.)

In the ordinance, the San Diego City Council found:

• "[I]n the interest of protecting the public health and preventing transmission of COVID-19, it is essential to avoid unnecessary housing displacement during the emergency and to prevent housed individuals from falling into homelessness";

• "[D]isplacement of residential tenants caused by eviction creates undue hardship on these tenants by making it difficult to follow public health orders and guidance of social distancing and isolation, and puts them at risk of homelessness due to the City's documented shortage of affordable housing";

• "[T]hrough 'no-fault' evictions, tenants can be evicted and displaced from their homes despite satisfying monthly rental obligations and acting in good faith to comply with the terms of their lease";

• "[A] tenant's sudden and immediate displacement caused by a 'no-fault' eviction can have a profound impact on the financial, emotional, and professional stability of a tenant's life, which impacts are compounded by the ongoing COVID-19 pandemic";

• "[E]victions have been associated with higher COVID-19 transmission and mortality through overcrowded living environments, transiency, reduced access to healthcare, and challenges to comply with mitigation strategies";

15

• "[W]hile in effect this Ordinance supersedes the Tenant's Right to Know Regulations regarding 'no-fault' evictions and enacts a temporary moratorium on 'no-fault' evictions to prevent tenant displacement, to promote economic stability and fairness within the City's rental market during the COVID-19 pandemic, to prevent avoidable homelessness, and to preserve the public peace, health, safety, and welfare";

• "[I]t is in the public interest to take steps to ensure people remain housed during this public health emergency";

• "[A]dopting this Ordinance is necessary and appropriate to address the threats to the public health. safety, and welfare of its citizens to ensure residents continue to have stable shelter and to protect residents from avoidable homelessness[.]"

The ordinance provides that subject to the above-referenced exceptions (see footnote 3, *ante*), "[a] landlord shall not evict, or endeavor to evict, a tenant where the grounds for terminating the tenancy or occupancy is not based on any alleged fault by the tenant." It provides that "[n]othing in this Ordinance relieves the tenant of the obligation to pay rent or restricts the landlord's ability to recover rent due." The ordinance's protections create an affirmative defense for tenants in an unlawful detainer action. The ordinance states "[t]hat the provisions of this Ordinance, being necessary for the welfare of the City of San Diego and its residents, shall be liberally construed to effectuate its purpose, which is to protect tenants from being evicted where grounds for terminating the tenancy or occupancy are not based on any alleged fault by the tenant during recovery from the COVID-19 pandemic."

We conclude City's decision to implement the eviction moratorium so as to protect the health, safety and welfare of citizens in response to the COVID-

16

19 public health emergency is a matter of discretion that may not be the subject of a section 526a taxpayer action. "Under article XI, section 7 of our state constitution, a 'county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws.' (Cal. Const., art. XI, § 7.) These powers are known generally as the police powers of local government." (*Department of Finance v. Commission on State Mandates* (2021) 59 Cal.App.5th 546, 561-562, citing *City and County of San Francisco v. Regents of University of California* (2019) 7 Cal.5th 536, 544.) "[T]he police power of a city is as broad as the police power exercised by the Legislature itself. . . . In exercising its police power, a city has broad discretion to determine what is reasonable in endeavoring to protect public safety, health, . . . and general welfare." (*Loska v. Superior Court* (1986) 188 Cal.App.3d 569, 575; accord, *Abeel v. Clark* (1890) 84 Cal. 226, 229-231 [" 'What is for the public good, and what are public purposes, and what does properly constitute a public burden, are questions which the legislature must decide upon its own judgment, and in respect to which it is invested with a large discretion, which cannot be controlled by the courts' "].)

We reject Siddell's argument that plaintiffs are entitled to bring the action as private attorneys general under section 1021.5. He correctly acknowledges that section 1021.5 "does not create standing." Section 1021.5 is an attorney fee statute; it creates an exception to the general rule that parties in litigation pay their own attorney fees, permitting a fee award for successful litigants who vindicate fundamental constitutional rights for the public benefit. (*Grossmont Union High School District v. Diego Plus Education Corp.* (2023) 98 Cal.App.5th 552, 570.) The statute does not permit parties who otherwise lack standing to maintain public interest litigation. Indeed, " '[t]here is no general "public interest" exception to the

17

requirement of standing.' " (*Spotlight on Coastal Corruption v. Kinsey* (2020) 57 Cal.App.5th 874, 883, quoting *People ex rel. Becerra v. Superior Court* (2018) 29 Cal.App.5th 486, 497.) "Public interest standing is available only in a mandate proceeding, not in an ordinary civil action." (*People ex rel. Becerra v. Superior Court*, at p. 503.)

Siddell further argues plaintiffs are entitled to bring a facial constitutional challenge—a claim that the ordinance is unconstitutional on its face—which assertedly does not require plaintiffs to show individualized harm. He points to *Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, and the court's explanation of a facial challenge. (*Id*. at p. 1084.) Citing *Landgate, Inc. v. California Coastal Commission* (1998) 17 Cal.4th 1006 and *City of Santa Monica v. Stewart* (2005) 126 Cal.App.4th 43, Siddell maintains courts routinely permit facial challenges in land use and housing contexts, and the court "erred by requiring plaintiffs to allege individualized enforcement or direct harm, thereby collapsing the distinction between facial and as-applied claims and misapplying controlling law."

*Landgate, Inc. v. California Coastal Commision*, *supra*, 17 Cal.4th 1006 does not address standing. And while *City of Santa Monica v. Stewart*, *supra*, 126 Cal.App.4th 43 discussed standing, it did so to hold one of the actions, by the City of Santa Monica, was not justiciable in that it failed both the standing and ripeness aspects of that concept. (*Id*. at pp. 59-60.) The city there challenged initiatives seeking to prevent city officials from receiving certain advantages from persons or entities who derived benefit from those officials' discretionary decisions. (*Id*. at p. 50.) The Court of Appeal found the city lacked traditional standing under section 367—it did not have " 'an actual and substantial interest in the subject matter of the action' " or stood to be " 'benefitted or injured' " by a judgment in the action (*id*. at p. 60)—

18

because it bore minimal responsibilities under the initiative, and the complaint did not specify any actual or threatened action which would injure the city or violate its rights. (*Ibid*.) Siddell does not discuss *City of Santa Monica* in depth, and it does not support his claim of taxpayer standing.

*Tobe v. City of Santa Ana* involved a city ordinance intending to maintain public streets and areas in a clean and accessible condition. (*Tobe v. City of Santa Ana, supra*, 9 Cal.4th at pp. 1080-1081.) The decision concerned whether the plaintiffs there—homeless persons, taxpayers and persons charged with violating the ordinance—had perfected an as-applied challenge to the ordinance. (*Id*. at p. 1083.) In discussing the issue, the court addressed the nature of challenges to ordinances and the sorts of beneficial interest plaintiffs must show.[11] Ultimately, the court did not decide whether the plaintiffs had such a beneficial interest because they had standing as taxpayers "to restrain illegal expenditure or waste of city funds on *future* enforcement of an unconstitutional ordinance or an impermissible means of enforcement of a facially valid ordinance." (*Id*. at p. 1086.) The court proceeded to conclude the plaintiffs had made only a facial attack on the

---

[11]  "To obtain mandate or other relief from penalties imposed under a past application of the law, the defendant must presently be suffering some adverse impact of the law which the court has the power to redress. [¶] If instead it is contended that an otherwise valid statute has been applied in a constitutionally impermissible manner in the past and the plaintiff seeks an injunction against future application of the statute in that manner, the plaintiff must show a pattern of impermissible enforcement. [Citations.] [¶] In most cases a plaintiff seeking this relief, either by a petition for writ of mandamus or complaint for declaratory and injunctive relief, must have a sufficient beneficial interest to have standing to prosecute the action, and there must be a present impermissible application of the challenged statute or ordinance which the court can remedy." (*Tobe v. City of Santa Ana, supra,* 9 Cal.4th at p. 1085.)

19

ordinance's constitutionality, and upheld its validity against that challenge. (*Id*. at pp. 1086-1109.)

Siddell misplaces reliance on *Tobe v. City of Santa Ana*, *supra*, 9 Cal.4th 1069 to advocate he and the other plaintiffs have standing. To the extent the court in *Tobe* addressed standing, it was dicta. And, the court stated without explanation that the plaintiffs there had taxpayer standing. We have found the contrary here. *Tobe* is inapposite in any event, since Siddell can no longer seek to restrain future enforcement, and does not argue the ordinance here is facially valid, unlike the plaintiffs with standing in *Tobe*. (*Tobe v. City of Santa Ana*, at p. 1086.)

Finally, Siddell argues the court erred by dismissing his case "based on a perceived deficiency in pleading—namely, the failure to allege specific harm to individual plaintiffs." He maintain the proper remedy was to grant him leave to amend to conform to proof at trial, or to hold continued proceedings on damages after further factual development. Siddell suggests the "factual record is still developing" in this case. The argument mischaracterizes both the court's order and disregards the procedural posture of the case. The court referred to the inadequate allegations because the parties had agreed to submit the matter on the pleadings for trial. The court's observation that the complaint lacked proof of individualized injury was not a ruling respecting damages, but one about threshold standing. Siddell had the burden on that point, but chose not to present any declaration on the matter, and did not appear at the trial on the merits. Absent standing, plaintiffs had no ability to maintain the suit or prove damages.

## II. *Claim of Unconstitutional Taking*

Notwithstanding our holding above, we have discretion to consider the merits of Siddell's takings challenge, particularly where the court gave the

parties a full opportunity to litigate the matter. (See *Taking Offense v. State*, *supra*, 18 Cal.5th at p. 919.) Doing so, we conclude the ordinance does not effect either a per se or regulatory taking.

A. *General Principles*

The Takings Clause of the Fifth Amendment provides that no "private property shall be taken for public use, without just compensation." (U.S. Const. 5th Amend.) The clause applies to the states through the Fourteenth Amendment. (*Kelo v. City of New London, Connectivut* (2005) 545 U.S. 469, fn. 1; *640 Tenth, LP v. Newsom*, *supra*, 78 Cal.App.5th at p. 859.)

"A physical taking occurs where the government physically intrudes upon a plaintiff's property or allows others to do so." (*640 Tenth, LP v. Newsom*, *supra*, 78 Cal.App.5th at p. 859, citing *Loretto v. Teleprompter Manhattan CATV Corp.* (1982) 458 U.S. 419, 427 & fn. 5.) Regulatory takings differ. A categorical regulatory taking will occur where a government regulation deprives the owner of all economically beneficial uses. (*640 Tenth*, at p. 860.) This type of regulatory taking is an "extraordinary circumstance when *no* productive or economically beneficial use of land is permitted." (*Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency* (2002) 535 U.S. 302, 330.) But " '[w]here a regulation places limitations on land that fall short of eliminating all economically beneficial use, a taking nonetheless may have occurred, depending on a complex of factors including the regulation's economic effect on the landowner, the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action.' " (*York v. City of Los Angeles* (2019) 33 Cal.App.5th 1178, 1193, quoting *Palazzolo v. Rhode Island* (2001) 533 U.S. 606, 617-618.)

Thus, "a government regulation that merely prohibits landlords from evicting tenants unwilling to pay a higher rent, [citation]; that bans certain private uses of a portion of an owner's property, [citations]; or that forbids the private use of certain airspace, [citation], does not constitute a categorical taking." (*Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency, supra,* 535 U.S. at pp. 322-323.) " 'The first category of cases requires courts to apply a clear rule; the second necessarily entails complex factual assessments of the purposes and economic effects of government actions.' " (*Id.* at p. 323, quoting *Yee v. City of Escondido* (1992) 503 U.S. 519, 523.)

B. *Per Se Taking*

Siddell contends the ordinance effected a per se taking by compelling physical occupation without consent. He says the ordinance "barred landlords from recovering possession of their property, even after a lease expired or a tenant ceased payment, thereby nullifying the owner's fundamental right to exclude—a core attribute of property ownership." He relies in part on the United States Supreme Court's decision in *Cedar Point Nursery v. Hassid* (2021) 594 U.S. 139, 149 (*Cedar Point*).[12]

A majority of the U.S. Supreme Court held in *Cedar Point* that if a regulation results in a physical appropriation of property, a per se taking has occurred. (*Cedar Point*, *supra*, 594 U.S. at p. 149.) Thus, where raisin growers were required to physically set aside a percentage of their crop for the government, the requirement constituted a physical taking. (*Ibid.*, citing *Horne v. Department of Agriculture* (2015) 576 U.S. 350, 361.)

In *Cedar Point*, a packing company and nursery sought to bring a claim for a per se physical taking by a California regulation enacted in 1975

_____

[12] Siddell also relies on the Federal Circuit Court of Appeals holding in *Darby Development v. United States* (Fed.Cir. 2024) 112 F.4th 1017, which he acknowledges is not binding on us.

granting labor organizations a right to enter agricultural employers' property for up to three hours per day, 120 days per year, to solicit unionization support. (*Cedar Point*, *supra*, 594 U.S. at pp. 143-144, 152; *id.* at p. 166 [Breyer, J. dissenting, noting year of enactment].) The petitioners did not seek compensation, but declaratory and injunctive relief to prohibit the regulation's enforcement against them. (*Id.* at p. 145.) The *Cedar Point* majority held they stated such a claim, reasoning that like government-authorized overflights of airplanes, the government's creation of an easement to permit boats through a developer's private marina, and a law requiring installation of cable equipment on landlords' properties, the government regulation "appropriated a right of access to the growers' property, allowing union organizers to traverse it at will for three hours a day, 120 days a year" and had "appropriate[d] a right to physically invade the growers' property—to literally 'take access' . . . ." (*Id.* at p. 152.) Characterizing the "right to exclude" as " 'one of the most treasured' rights of property ownership,' " the court stated: "Rather than restraining the grower's use of their own property, the regulation appropriates for the enjoyment of third parties the owners' right to exclude." (*Id.* at p. 150.) It was therefore a per se, uncompensated, physical taking in violation of the Fifth and Fourteenth Amendments. (*Ibid.*; see also *id.* at p. 152.) The court found the temporary duration of the physical appropriation irrelevant to the inquiry of whether a per se physical taking had occurred; according to the majority, that bore only on the amount of compensation. (*Id.* at p. 153.)

The *Cedar Point* majority addressed concerns that its holding would endanger a host of government activities involving entry onto private property. (*Cedar Point*, *supra*, 594 U.S. at p. 159.) It emphasized that certain government-authorized physical invasions would not amount to

takings because they were "consistent with longstanding background restrictions on property rights." (*Id*. at p. 160.) The court pointed out that "the government does not take a property interest when it merely asserts a 'pre-existing limitation upon the landowner's title.' " (*Ibid*.) It said such background limitations "also encompass traditional common law privileges to access private property," including one that "allowed individuals to enter property in the event of public or private necessity." (*Id*. at pp. 160-161 [citing Restatement principles discussing entry "to avert an imminent public disaster" or "to avert serious harm to a person . . . ."].) The California access regulation at issue fell under neither of those exceptions because "no traditional background principle of property law requires the growers to admit union organizers onto their premises," and "unlike standard health and safety inspections, the access regulation is not germane to any benefit provided to agricultural employers or any risk posed to the public." (*Id*. at p. 162.)

The ordinance here is materially different from the regulation at issue in *Cedar Point, supra*, 594 U.S. 139. It is consistent with the sort of background limitations directed at averting public health disasters, and circumstances involving a pre-existing limitation on the plaintiffs' property rights, namely the rental lease or contract by which the owners invited tenants to inhabit the premises. (Accord, *Yee v. City of Escondido, supra*, 503 U.S. at pp. 522, 528-529 [rejecting mobile home park owners' claim of physical occupation by state mobile home law and rent control ordinance; "Put bluntly no government has required any physical invasion of [the park owner's] property. [The] tenants were invited by [the park owners], not forced upon them by the government" and the existence of a wealth transfer in itself does not convert regulation into physical invasion].) Because it was

24

warranted by the COVID-19 public health emergency, the ordinance is more akin to a health and safety regulation than the access regulation at issue in *Cedar Point*. (Accord, *Block v. Hirsh* (1921) 256 U.S. 135, 154, 156-157 [rejecting landlord's claim of unconstitutional taking by legislation necessitated by "emergencies growing out of the war" requiring a landlord give 30 days notice to repossess property, reasoning "[h]ousing is a necessary of life. All the elements of a public interest justifying some degree of public control are present"].) "[P]roperty in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community, [citations] and the Takings Clause did not transform that principle to one that requires compensation whenever the State asserts its power to enforce it." (*Keystone Bituminous Coal Association v. DeBenedictis* (1987) 480 U.S. 470, 491-492, see also *id.* at p. 485 ["the character of the governmental action involved here leans heavily against finding a taking; the Commonwealth of Pennsylvania has acted to arrest what it perceives to be a significant threat to the common welfare"].)[13]

Further, the ordinance does not appropriate property "for the enjoyment of third parties . . . ." (Compare, *Cedar Point*, at p. 150 and *F.C.C. v. Florida Power Corp.* (1987) 480 U.S. 245, 252 ["statutes regulating the economic relations of landlords and tenants are not *per se* takings. [Citations.] 'So long as these regulations do not *require* the landlord to suffer the physical occupation of a portion of his building *by a third party*, they will

---

[13] In *Lingle v. Chevron U.S.A. Inc.* (2005) 544 U.S. 528, 545, the court made clear it was not disturbing the holding of *Keystone Bituminous Coal Association v. DeBenedictis*, *supra*, 480 U.S. 470, even though *Keystone* "arguably" (*Lingle*, at p. 545) used language of a since-disapproved "substantially advances" formula for an unconstitutional taking. (*Lingle*, at pp. 545-546 ["We emphasize that our holding today . . . does not require us to disturb any of our prior holdings," citing *Keystone*].)

be analyzed under the multifactor inquiry generally applicable to nonpossessory governmental activity,' " second italics added], citing *Loretto v. Tele-prompter Manhattan CATV Corp., supra*, 458 U.S. at p. 440.)  While under the ordinance landlords could not evict renters for no fault of their own during its duration, they did not lose their right to exclude strangers as in *Cedar Point*.  In sum, the ordinance did not amount to a government appropriation of property.  We hold *Cedar Point* does not support Siddell's argument of a per se physical taking.

C.  *Regulatory Taking*

Nor does the ordinance effect a regulatory taking.  The ordinance does not constitute a categorical regulatory taking, since landlords subject to it still enjoy economic benefits of ownership.  Even under the eviction moratorium, landlords can continue to accept rental payments from tenants.  Their properties have not been rendered "economically idle."  (*Lucas v. S.C. Coastal Council* (1992) 505 U.S. 1003, 1019.)

To the extent Siddell claims a noncategorical regulatory taking, the trial court concluded that City had met its burden of showing necessity due to the pandemic.  We agree plaintiffs are not entitled to inverse condemnation compensation under the "emergency exception to the just compensation requirement" (*Customer Co. v. City of Sacramento* (1995) 10 Cal.4th 368, 383) for City's legitimate exercise of its police power.  The "general rule is that damage to, or even destruction of, property pursuant to a valid exercise of the police power often requires no compensation under the just compensation clause.  '[I]n its legitimate exercise the police power often works not only damage to property but destruction of property.  Injury to property can and often does result from the demolition of buildings to prevent the spread of conflagration, from the abandonment of an existing highway, from the

enforced necessity of improving property in particular ways to conform to police regulations and requirements . . . . And equally well settled and understood is the law that in the exercise of this same power property may in some, and indeed in many, instances be utterly destroyed. The destruction of buildings, of diseased animals, of rotten fruit, of infected trees, are cases that at once come to mind as applicable to both personalty and realty. Always the question in each case is whether the particular act complained of is without the legitimate purview and scope of the police power. If it be [outside the entities' legitimate police power], then the complainant is entitled to injunctive relief or to compensation. If it be [within the legitimate police power], then it matters not what may be his loss, it is *damnum absque injuria* [damage without injury].' " (*Customer Co. v. City of Sacramento, supra,* 10 Cal.4th at p. 383; see also *Pacific Bell v. City of San Diego* (2000) 81 Cal.App.4th 596, 603, fn. 6 [noting the police power or emergency exception to inverse condemnation has a "venerable history" in both state and federal courts], in part citing *House v. L.A. County Flood Control Dist.* (1944) 25 Cal.2d 384, 391 ["Unquestionably, under the pressure of public necessity and to avert impending peril, the legitimate exercise of the police power often works not only avoidable damage but destruction of property without calling for compensation . . . . In such cases calling for immediate action the emergency constitutes full justification for the measures taken to control the menacing condition, and private interests must be held wholly subservient to the right of the state to proceed in such manner as it deems appropriate for the protection of the public health or safety"].)

In *640 Tenth, LP v. Newsom*, this court discussed the exception in addressing business owners' claim that the California Governor's emergency stay-at-home orders effected a regulatory taking. (*640 Tenth, LP v. Newsom*,

*supra*, 78 Cal.App.5th at pp. 849, 863-865.) This court observed that an analytic approach in assessing the character of the governmental action, one of the relevant factors in assessing whether a regulatory taking has occurred,[14] was to focus on whether a regulation was designed to prevent serious public harm. (*Id.* at pp. 863-864.) While we acknowledged the business restrictions adversely affected the owners' reasonable investment-backed expectations, "the Governor's emergency orders 'are quintessential examples of regulations that "adjust[ ] the benefits and burdens of economic life to promote the common good." ' [Citation.] The character of these actions is akin to that of other historical examples of governmental actions undertaken to counter serious threats to the public that were subsequently found not to be takings." (*Id.* at p. 864.)

We have no difficulty applying the exception to City's temporary no-fault eviction moratorium, enacted in furtherance of public health and safety

---

14 In evaluating a claim of a non-categorical regulatory taking, we balance three factors: "(1) the economic impact of the regulation; (2) its interference with reasonable investment-backed expectations; and (3) the character of the government action." (*640 Tenth, LP v. Newsom, supra*, 78 Cal.App.5th at p. 860, citing *Horne v. Department of Agriculture, supra*, 576 U.S. at pp. 351, 360.)

interests stemming from to the deadly COVID-19 pandemic.[15]  We are not the first court to reach this conclusion in takings challenges to other eviction moratorium policies.  (See *Southern California Rental Housing Association v. County of San Diego*, *supra*, 550 F.Supp.3d at p. 867 [holding San Diego County temporary eviction moratorium ordinance did not violate the Takings Clause; the ordinance "was enacted with the stated purpose of ensuring that citizens could remain housed during the unprecedented COVID-19 pandemic to limit the spread of a deadly virus.  . . .  [T]he [o]rdinance clearly sets forth the dangers associated with renters being evicted, and potentially forced to move in with family or friends, use community shelters, or became homeless, as the risk of COVID-19 transmission increases with close contact.  The [o]rdinance acts to create a temporary shift in the burdens and benefits of the landlord-tenant relationship with the stated purpose of advancing the common good"]; *238 Serrano Properties LLC et al. v. The State of California* (C.D.Cal 2025) 2025 WL 2946988, at pp. *7-8 [rejecting takings challenge to southern California city and county eviction moratoria stemming from the pandemic because the defendants "acted to promote public safety health, and

_____

[15]    "The COVID-19 global pandemic is the gravest public health crisis in over a century.  At present, the novel coronavirus has killed at least 230,000 Americans and infected over 9 million more.  The true toll may never be known, but is likely significantly higher.  The Centers for Disease Control and Prevention . . . , for example, estimates that the number of 'excess deaths' in the United States is closer to 300,000.  Neither the State of California nor the City of Los Angeles have been spared from the ravages of COVID-19.  Nearly a million Californians have been infected, and nearly 18,000 have died."  (*Apartment Association of Los Angeles County, Inc. v. City of Los Angeles* (C.D.Cal. 2020) 550 F.Supp.3d 1088, 1090, 1100-1103, fns. omitted [holding association seeking preliminary injunction against City eviction moratorium did not demonstrate landlords were likely to suffer irreparable harm, and balance of equities required that hardships "must yield precedence to the vital interests of the public as a whole"].)

29

the common good during an unprecedented pandemic" and the "policies to address the COVID-19 pandemic lack the character of government action that would constitute a regulatory taking"; "this [c]ourt as well as other district courts have found the similar regulations served to adjust the benefits and burdens of the COVID-19 pandemic to promote the common good. [Citations.] Without [d]efendants' policies it is probable that many tenants residing within plaintiffs' properties would have been evicted. The result of such evictions would pose the 'harms typical of mass displacements' as well as the 'exacerbate[ed] spread of COVID-19 as well, to the detriment of all' "].)

## DISPOSITION

The judgment is affirmed. City shall recover its costs on appeal.


O'ROURKE, J.

WE CONCUR:


McCONNELL, P. J.


IRION, J.